UNITED STATES of America

v.

Martha CONCEPCION, a/k/a Martha Martinez, a/k/a Martha Morales, a/k/a Julianna Sanchez, a/k/a Sonia Serrano, a/k/a Gladys Torres, Defendant.

UNITED STATES of America

v.

Ana MORILLO, a/k/a Rossi Colon, a/k/a Marta Fernandez, a/k/a Luz Lopez, a/k/a Gloria Velez, a/k/a Jeanette Ruiz, Defendant.

UNITED STATES of America

v.

Jane ARENDELL, a/k/a Maria Gonzalez, a/k/a Annette Rivera, Defendant.

UNITED STATES of America

v.

Dinorah CABA, a/k/a Digna Rios, a/k/a Dinorah Santana, a/k/a Maria Santana, a/k/a Maritza Santana, Defendant.

UNITED STATES of America

v.

Anna VEGA, a/k/a Ana Vega, a/k/a Ana Hernandez, Defendant.

UNITED STATES of America

v.

Lourdes ARIAS, a/k/a Hilda Lopez, a/k/a Judy Ojeda, a/k/a Yvette Rivera, Francisca Vargas, Defendant.

UNITED STATES of America

v.

Esperanza LARA, a/k/a Maria Candeleria, a/k/a Anny Centreras, a/k/a Pura Concepcion, a/k/a Ivette Matos, a/k/a Janet Rivera, a/k/a Janet Rodriguez, a/k/a Milagros Soto, Defendant.

UNITED STATES of America

v.

Mayra COLLADO, a/k/a Veronica Ayala, a/k/a Cristina Mejias, a/k/a Josephine Minaya, Defendant.

UNITED STATES of America

v.

Maria RAMIREZ, a/k/a Ana Moldonado, a/k/a Marina Ramirez, Defendant.

UNITED STATES of America

v.

Patria Mabel MERCEDES, a/k/a Carmen Marrero, a/k/a Marcy Pelier, Defendant.

UNITED STATES of America

v.

Georgina CEPIN, a/k/a Maria Gonzalez, Margarita Rodriguez, a/k/a Evelyn Rosario, a/k/a Antonia Sanchez, Defendant.

UNITED STATES of America

v.

Maria BAEZ, a/k/a Iris Cruz, a/k/a Maria Gonzalez, a/k/a Sara Gonzalez, a/k/a Yaraina Graciano, a/k/a Rosaura Lopez, a/k/a Elsa Rias, a/k/a Miriam Santana, a/k/a Sabrina Soto, a/k/a Maritza Torres, Defendant.

UNITED STATES of America

v.

Griselina OGIRRI, a/k/a Griselina Altagracia Rodriquez de Then, a/k/a Griselina Then–Amparo, Defendant.

UNITED STATES of America

v.

Sonia JIMINEZ, a/k/a Maritza Cruz, a/k/a Patria Germosen, a/k/a Salina Salas, a/k/a Noemi Santiago, a/k/a Maribel Vega, Defendant.

UNITED STATES of America

v.

Calidad Reynoso Peralta MACK, a/k/a Marina Garcia, a/k/a Caridad Mack, a/k/a Maria Perez, a/k/a Diana Pons, a/k/a Sandra Torres, Defendant.

UNITED STATES of America

v.

Flavia POLANCO, a/k/a Carmen Garcia, a/k/a Zurma Gonzalez, a/k/a Guillermina Rivera, a/k/a Xiomara Soto, a/k/a Xiomara Vargas, Defendant.

UNITED STATES of America

v.

Marilyn PEREZ, a/k/a Maria Rivera,
a/k/a Sonya Rivera, Defendant.

UNITED STATES of America

v.

Elvira GARCIA, a/k/a Sonia Hernandez,
Altagracia Pena, a/k/a Cesaria Rivera,
a/k/a Flora Rivera, Defendant.

UNITED STATES of America

v.

Rosario LOPEZ, a/k/a Sara Calderon,
a/k/a Maria Medina, Defendant.

UNITED STATES of America

v.

Mercedes PERALTA, a/k/a Sandra
Colon, a/k/a Melagros Rivera,
Defendant.

Nos. CR 91–781, CR 91–821, CR 91–822,
CR 91–844 to CR 91–848, CR 91–902, CR
91–936, CR 91–937, CR 91–1100, CR 91–
1194, CR 91–1254, CR 91–1265, CR 91–
1267, CR 91–1268, CR 91–1282, CR 91–
1283 and CR 92–264.

United States District Court,
E.D. New York.

July 16, 1992.

Andrew J. Maloney, U.S. Atty., by Gordon Mehler and Michael Considine, Asst. U.S. Attys., for U.S.

Steven Gold, Gen. Counsel, Dept. of Investigation, Henry M. Adler, Associate Gen. Counsel, Human Resources Admin., New York City, for City of New York.

Robert Sackett, New York City, for Concepcion.

Thomas Farrell, Legal Aid Soc., Brooklyn, N.Y., for Morillo.

John Burke, Brooklyn, N.Y., for Arendell.

Owen Daley, Brooklyn, N.Y., for Caba.

David Lewis, New York City, for Arias.

David Segal, New York City, for Vega.

Howard Leader, New York City, for Lara.

Barry Weinstein, Bronx, N.Y., for Collado.

Lawrence Ferguson, New York City, for Ramirez.

Ronald Garnett, New York City, for Mercedes.

Russell Carbone, Kew Gardens, N.Y., for Cepin.

John Villios, MacCarthy Associates, New York City, for Baez.

Frank Lopez, Brooklyn, N.Y., for Ogirri.

Edward Jenks, Mineola, N.Y., for Jiminez.

Lawrence Schoenbach, New York City, for Mack.

Allen Lashley, Brooklyn, N.Y., for Polanco.

Peter Birkett, Brooklyn, N.Y., for Perez.

Heriberto Cabrera, New York City, for Garcia.

Bernard Udell, Brooklyn, N.Y., for Lopez.

Stephen Goldenberg, New York City, for Peralta.

## AMENDED MEMORANDUM AND ORDER

WEINSTEIN, District Judge:

## TABLE OF CONTENTS

I. FACTS .................................................... ——
II. PUNISHMENT............................................... ——
 A. General Considerations ............................... ——
 B. Alternatives......................................... ——
 1. Deportation ................................... ——
 2. Imprisonment, Probation, Community or Home Incarceration, Fines, Restitution, Community Service, Supervised Release ............ ——
 a. Sentencing Statutes......................... ——
 b. Sentencing Guidelines ...................... ——
 c. Departures From the Guidelines.............. ——
 3. Denial or Limitation of Future Benefits ......... ——
 4. Modification of Sentences ...................... ——
III. INDIVIDUAL SENTENCES ................................. ——
 A. General Considerations ............................... ——
 B. Defendants ........................................ ——
 1. Martha Concepcion .......................... ——
 2. Ana Morillo ................................. ——
 3. Jane Arendell ............................... ——
 4. Dinorah Caba ............................... ——
 5. Anna Vega................................... ——
 6. Lourdes Arias ............................... ——
 7. Esperanza Lara .............................. ——
 8. Mayra Collado............................... ——
 9. Maria Ramirez .............................. ——
 10. Patria Mercedes ............................. ——
 11. Georgina Cepin.............................. ——
 12. Maria Baez.................................. ——
 13. Griselina Ogirri............................. ——
 14. Sonia Jiminez .............................. ——
 15. Calidad Mack............................... ——
 16. Flavia Polanco.............................. ——
 17. Marilyn Perez .............................. ——
 18. Elvira Garcia............................... ——
 19. Rosario Lopez .............................. ——
 20. Mercedes Peralta ........................... ——
IV. SUMMARY OF SENTENCES.............................. ——
V. CONTINUING OBLIGATIONS OF PROBATION DEPARTMENT ......... ——
VI. CONCLUSION ........................................... ——

These twenty defendants represent the first of approximately fifty-five who are being prosecuted in this court for fraudulently obtaining assistance from the Aid to Families with Dependent Children (AFDC), Food Stamp and Medicaid programs for the poor. The group now before the court consists primarily of Dominican women who bought, sold and used false identity documents and who bribed government employees to obtain government funds. Some of the defendants used as many as nine aliases and obtained upwards of $50,000 per year in welfare payments. Others who sold and forged documents, took bribes or helped manage the scheme netted hundreds of thousands of dollars each.

All twenty defendants have pleaded guilty to federal crimes. Their sentencing raises difficult issues as to the proper role of the court and other agencies in preventing and punishing welfare fraud. To arrive at sentences that protect the public and are fair to the defendants requires an analysis of the theoretical bases for punishment, governing statutes and the work of the federal Sentencing Commission.

## I. FACTS

Nineteen of the defendants have pleaded guilty to fraudulently obtaining AFDC payments and food stamps in violation of 18 U.S.C. § 641. Section 641 provides:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof ... or

> Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

> Shall be [guilty of a felony].

The statutory maximum penalty for violations of section 641 involving property worth more than $100 is a $10,000 fine and ten years imprisonment. *Id.* 18 U.S.C. § 3571(b)(3) provides for additional fines up to $250,000. The statutory punishment scheme may in turn be affected by the Sentencing Guidelines. Those of the defendants who are aliens may also be subject to deportation under federal statutes at the determination of the Immigration and Naturalization Service (INS).

One defendant, an employee of the New York City Human Resources Administration (HRA) who accepted cash payments in return for assisting the defrauders, has pleaded guilty to violating 18 U.S.C. § 666. It reads in relevant part:

> (a) Whoever ... (1) being an agent of an organization, or of a State [or] local ... government, or any agency thereof— ... (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more [shall be guilty of a crime.]

18 U.S.C. § 666(a)(1)(B). The statute provides that violators receive up to ten years in prison and fines as determined under 18 U.S.C. § 3571 *et seq.*

Under the federal Food Stamp program, persons living in households with limited disposable income are provided with coupons redeemable at retail food stores. In fiscal year 1989, about 20 million persons in this country received food stamps. United States Department of Commerce, Bureau of the Census, *Statistical Abstract of the United States 1990*, Table No. 605 (Cash and Noncash Benefits for Persons with Limited Income); *see also* N.Y. Times, June 29, 1992, at A1 ("One American in 10 is now on food stamps, the highest proportion ever."). The total federal expenditure for the Food Stamp program in that year was about $11 billion. *Id.* In New York in 1988, some 10 percent of all households— about 1.5 million persons—received food

stamps at a cost of over $900 million. *Id.* at Table No. 606 (Federal Food Stamp and National School Lunch Programs, By State).

AFDC is funded jointly by federal, state and local governments. In 1988, more than 3.5 million families nationally benefited from AFDC, receiving an average of $379 per month in payments. *Id.* at Table No. 607 (Public Aid—Recipients and Average Monthly Cash Payments Under Supplemental Security Income and Public Assistance: 1975–88). AFDC families received nearly $17 billion in assistance that year, with New Yorkers obtaining $2 billion. *Id.* at Table No. 610 (AFDC and Supplemental Security Income—Recipients and Payments, States and other Areas: 1980 to 1988).

In New York City, AFDC benefits and food stamps are provided through the Department of Social Services (DSS), a division of the New York City HRA. In April 1992, the latest period for which figures are available, HRA was responsible for 258,362 cases involving a total expenditure of federal, state and city funds of $132,952,266. The administrative cost of running the program for the month was almost $21 million. *See Memorandum from Director, Office Systems Planning, Research & Evaluation, Human Resources Administration, to Acting Deputy Commissioner, Income Support Programs, Human Resources Administration* (June 19, 1992).

Persons seeking AFDC aid and food stamps in New York City apply through one of several DSS Income Maintenance Centers. They must provide detailed identity information at these centers, including their social security numbers and those of their dependent children. Based on this documentation, the DSS determines the package of AFDC, Food Stamp and Medicaid benefits to which the applicant is entitled under law. A single parent of three children on public assistance normally is eligible to receive about $800 per month. Benefits are issued for periods not longer than six months, at which time recipients must re-establish their continued need of assistance.

In 1990, the New York City Department of Investigation (DOI), following a confidential informant's tip, began an investigation into ongoing welfare fraud. It eventually discovered that nearly 1,000 fictitious cases—in the order of one-half of one percent of active welfare cases in New York City—had been opened in various City welfare centers.

Women claiming need for benefits would apply for multiple benefit packages under several names by using false birth certificates for both mother and children, social security numbers not yet issued by the Social Security Administration, false immigration records, and other forged documents. The typical applicant claimed under each name to be the mother of three preschool-aged children, making the fraud harder to detect by preventing HRA from checking Board of Education records. To avoid detection of the multiple files, the claimants usually listed a different false address for each case. Nevertheless, as many as twelve false cases used exactly the same address and apartment.

Forgers prepared and sold the phony documents to retailers for $800 to $1,000. The retailers then recruited clients and provided them with a package of documents at a marked-up price of $1,800 to $2,500. The recruiters also charged an initial fee of $700 to $1,500 or would arrange to split future cash and food stamp proceeds. Some of the retailers maintained their own fraudulent cases. Retailers often arranged for the recipients to pay a fee of about $50 to third parties so that the recipients could arrange to have their welfare payments delivered to the third party's address for safekeeping.

With the false documents in hand, the applicant would proceed to an Income Maintenance Center in Brooklyn, Queens, Manhattan or the Bronx. Within a week she would have her photographic welfare identification. Using this ID card she would be able to collect a bimonthly check and food stamps at any New York check

cashing establishment linked to the HRA benefits dispensing system.

Individual defrauders obtained anywhere from $30,000 to $313,000 over the course of several years. Some recruiters were directly or indirectly responsible for well over a million dollars in fraudulent payments to themselves and others. Current estimates indicate that the total amount of the fraud perpetrated by this scheme on the New York City HRA is approximately $5,600,000, not counting Medicaid benefits. The DOI estimates that welfare fraud in New York City has cost the city, state and federal governments almost 45 million dollars since 1985.

In some cases City employees were bribed to approve the applications. In others the conspiracy operated successfully because of administrative ineptitude on the part of HRA—this despite the program's substantial administrative cost. At the most basic level, HRA did not run simple computer checks with the federal Social Security Administration to determine if the social security numbers being used by the defendants had been issued. HRA also failed to forward prompt warnings to the local centers where a problem was brought to its attention. Many HRA workers were so poorly supervised that they did not understand the nature of the warnings they did receive. Information on computers indicating that many families shared the same apartment prompted no action. HRA also neglected to use the Department of Health's database of birth certificates to vet applicants.

While not criminally liable, those responsible for such lackadaisical administration must be considered key participants in this series of frauds. Cf. Louk Hulsman, The Abolitionist Case: Alternative Crime Policies, 25 Isr.L.Rev. 681, 690–91 (1991) (relying on Report on Decriminalization, Council of Europe (1980)). As the Commissioner of the New York City Department of Investigation has indicated:

> Although some of the fraudulent issuances discovered during the course of our investigation were directly caused by the involvement of employees, in many cases the clients did not need the employees to perpetrate the scheme. The clients were able to take advantage of the lack of appropriate control and oversight mechanisms to open these bogus cases and receive benefits not due them.
>
> For these reasons, criminal investigations, like that conducted by my office, are successful in the long term only if followed by effective management actions to prevent fraudulent cases from being entered on the rolls and to remove such cases as vigorously as possible. It is therefore essential that HRA expeditiously take action: 1) to remove from the rolls, after consultation with my office so as to prevent interference with ongoing corruption investigations, the 900 probable fraudulent cases using futuristic [social security numbers]; and 2) to verify identifying information for [another] approximately 80,000 [HRA] clients....

*Memorandum from Inspector General, Department of Investigation, to Commissioner, Human Resources Administration* 7 (July 26, 1991).

HRA has provided documents suggesting that part of the problem was that New York State's Welfare Management System required reliance on new "Client Identification Numbers" rather than Social Security Numbers which had previously been used by New York City as its primary means of identifying eligible recipients. This and other failures of coordination between state and city offices may explain some of the confusion. *See, e.g., Memorandum from Deputy Commissioner, Income Support Programs, Human Resources Administration, to Commissioner, Human Resources Administration* (July 18, 1991); *Memorandum from Acting Deputy Commissioner, Income Support Programs, Human Resources Administration, to Inspector General, Department of Investigation* (Sept. 13, 1991); *Memorandum from Acting Deputy Commissioner, Income Support Programs, Human Resources Administration, to Income Maintenance Center Directors* (Nov. 21, 1991); *Memorandum from Acting Deputy Commissioner, Income Support Programs,*

*Human Resources Administration, to First Deputy Commissioner, Family Support Administration, Human Resources Administration* (June 1, 1992). Any system that requires communication among three tiers of government, operates according to complex formulae for determining appropriate payments, and serves a fluctuating and extremely mobile group of often desperate clients numbering in the hundreds of thousands will be vulnerable to fraud. Moreover, too rigid a system will prevent those who are entitled to prompt help from getting it. When all is said and done, however, HRA must accept substantial responsibility for permitting this widespread conspiracy to run unchecked for five years.

HRA is now initiating anti-fraud measures. DOI has recommended that all recipients be fingerprinted to take advantage of present technology which can match fingerprints rapidly. *But see* Jeffrey Plaut, *When Welfare Tries Fingerprints*, N.Y. Times, April 23, 1992 (questioning worth of fingerprint system based on usage in Los Angeles). Alternative mechanisms can compare photo identifications by computer. Although expensive, these technologies might be useful. Since it is apparent that any system that requires low-level employee initiative will tend to break down, the more reflexive the tests the better.

## II. PUNISHMENT

### A. General Considerations

The sentencing issues raised in these cases are among the most difficult and sensitive with which a court must deal. The primary goal of punishment in this case is to deter, to the extent possible, future defalcations of government assistance funds. A second purpose is to rehabilitate the defendants.

There is a temptation simply to skirt these underlying concerns and entrust the task of punishment to the federal Sentencing Guidelines. Alleviating the courts' sentencing burdens is not, however, the Guidelines' statutory function. Congress has directed the federal courts to impose penalties "not greater than necessary" to achieve the statutorily defined purposes of sentencing. 18 U.S.C. § 3553(a)(2); *see also* 18 U.S.C. § 3553(a)(1) (court must consider individual history and characteristics of offender); 18 U.S.C. § 3661 (same); *cf.* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 Yale L.J. 1681, 1746 (1992) (under federal sentencing provisions, courts must depart from Guidelines "when the prescribed sentence seems inappropriate").

This is not the place to rehearse the enormous theoretical, historical and pragmatic issues raised by punishment. *See generally* International Symposium, "Justice in Punishment," 25 Isr.L.Rev. 283–791 (1991). It is enough to say that the statutory scheme established by Congress acknowledges these issues and has recognized the need to allow Article III judges wide discretion to weigh, with the aid of the Sentencing Commission and other institutions, the complex of considerations underlying sentencing.

■ In the instant cases, the Guidelines are not binding, although they have some utility as indicators of how other courts have treated other cases of fraud. *See* Part II B 2 a, *infra* (discussing statutory scheme for determining applicability of Guidelines and other sentencing criteria). Because they are based primarily on statistical averages of sentences imposed in the past, the Guidelines are of limited help where the crime and those who participate in it present special issues not normally faced in other cases. Equating multifarious frauds and defendants known to the courts in the past with those now before this court would deny both society and defendants the justice to which they are entitled under federal statutes and the Constitution. Converting the sentencing process into a mechanical, unreflective aggregation of numbers is emphatically not what Congress or the Constitution requires of independent Article III federal judges.

"[A]ny morally tolerable account of [criminal punishment] must exhibit it as a compromise between distinct and partly

conflicting principles." H.L.A. Hart, *Punishment and Responsibility* 1 (1968). From a Utilitarian perspective, proper punishment should maximize the net good to the public. It is, however, difficult to determine when more good than harm has been achieved, particularly when each sentence will have significant consequences on two or three generations of family members. *See* Kent Greenawalt, "Punishment," 3 *Encyclopedia of Crime and Criminal Justice* 1336 (1982) (Utilitarian calculation must consider, *inter alia*, general deterrence; specific deterrence; norm reinforcement; defendants' future conduct, including need for incapacitation and possibility of reform; and retribution to prevent public dissatisfaction with criminal law). A signal must be sent to those tempted to cheat that even a little cheating will result in considerable pain. Organized cheating, particularly the betrayal of the public trust by government employees, must be treated relatively harshly since potentially widespread and serious harm is posed by those who ignore their official obligation to protect society's resources to assist criminals.

Criminal sanctions against these defendants ideally ought to be accompanied by disciplinary action for the non-criminal acts and omissions of executives and employees whose ineptitude created and preserved the conditions that made welfare fraud easier than it should be. The soldier placed in unnecessary danger who breaks and runs needs to be punished for the sake of deterrence, but so too do the higher-ups who created the needless hazard.

Communitarian considerations support these conclusions. To the extent that citizens have a responsibility to act for the good of the community, they may be punished when they flout their social responsibilities by stealing from, rather than contributing to, society.

Individual defendants, particularly those most harshly punished, will take little comfort in a philosophical view of their situation. The defendants can perhaps claim that their dignity and rights as ends-in-themselves are being violated because they are being sacrificed for the good of society as a whole. Yet the laws and mores against defrauding the public are hardly arcane or inaccessible and are entirely necessary for the protection of both taxpayers and needy citizens and for the maintenance of a society in which the exercise of individual liberty is possible. The potential statutory penalties—including up to ten years in prison—are far more severe that those being imposed. None of the defendants has claimed or can claim to have failed to appreciate the iniquity of her acts. Under these circumstances it is not unjust to sacrifice the liberties of some for the benefit of others. It is impossible in administering the criminal law not to treat a guilty defendant as both an end-in-herself—a person whose free will and dignity require that she be treated as both responsible for her crimes and deserving of a chance for rehabilitation and a productive life—and as a means to provide an example that may encourage others to discipline themselves.

These defendants have no cause to complain of any substantive or procedural injustice. They have pleaded guilty after being given every procedural protection—including excellent attorneys, most paid for by the government—and a full opportunity to prove extenuating circumstances. All were allowed to remain free on bail while investigators and prosecutions went forward. The defendants have received every consideration that a humane government can allow.

The justice of punishing these defendants is not brought into question by the existence of a large group of potential defendants who are apparently not being prosecuted as a result of discretionary prosecutorial decisions not to pursue the less culpable cheaters. Declinations to prosecute are necessary in a society such as ours where crime is so rife that an attempt to pursue every delict would so overload the criminal justice system as to cause its breakdown. The malfeasances of the larger group can be handled administratively by having welfare authorities apply restitution sanctions and, in some instances, by deportation. The criminal law is not unjust because it is impracticable to apply it implacably to every criminal.

■ Each defendant's cooperation with the government is entitled to substantial consideration as a distinguishing feature between cases. Without some understanding on defendants' part that they will be rewarded for assisting the government, apprehension of the most culpable often would be impossible.

The court has been urged not to ignore the public disillusionment inevitably triggered by the misuse of funds supplied by taxpayers—many themselves at the edge of poverty. In sentencing, courts cannot help but be aware of the damage that may be done to the citizenry's shared sense of community and humanity and the danger posed to countless individuals by providing a convenient excuse to reduce assistance to those honest poor who need and deserve help. In the instant cases it has not been necessary to enhance sentences on this ground.

■ The punishments set out in the federal Sentencing Guidelines are not well adapted to serve the various purposes just discussed. They are of minimal value in determining how to treat each individual defendant because, among other reasons, they view punishment of these defendants almost entirely as a matter of imprisonment for periods determined by the dollar amount lost by federal, state and city governments. This is because the Guidelines, in seeking to achieve uniformity, rely on a narrow range of easily quantified data. Largely ignored are other relevant criteria, such as the length of time for which each defendant was receiving illegal payments, the number of false names each defendant used, the nature and extent of each defendant's participation in the scheme, the extent to which a defendant corrupted others by inducing them to participate, each defendant's background and circumstances and the needs of the defendants' children and extended families. While the Commission made an effort to determine how other judges were sentencing in 1985, the survey sample did not include any substantial number of cases such as those now before us, and the almost decade old account of judicial "practice" is now fossilized. See Yoram Schachar, *Sentencing As Art*, 25 Isr.L.Rev. 638, 659 (1991).

An important issue to consider in these cases is how to achieve general deterrence where the same crime is perpetrated by large numbers of people, the majority of whom escape punishment. At least in theory, the level of pain applied to the few who are apprehended should be higher than that applied to each if all were caught. This is because the would-be criminal rationally contemplating the crime—a necessary legal fiction in most cases—will reconsider the low probability of getting caught in light of the greater punishment. Where many defendants are prosecuted at once, or where the media makes a particular punishment highly visible, the prospective perpetrator may be even more likely to reconsider. Because the Guidelines are, in the main, based on individual, low-profile sentences, they do not adequately take into account the special features of mass sentencing. Certainly the prosecutions and sentences now before the court will not go unnoticed in the New York City welfare community.

A range of punishments reflective of the varying aims of sentencing is therefore appropriate, depending on the circumstances and acts of each defendant. These include (separately or in combination) deportation; prison terms; incarceration within the community or at home while defendants are closely monitored and compelled to work on community projects or for taxable compensation; restitution; fines; and limits on future access to public benefits.

## B. Alternatives

### 1. Deportation

Most of the defendants are citizens of the Dominican Republic who have status as documented aliens with "green cards" that permit them to work in this country. Perhaps the most severe punishment that can be imposed on these defendants is to banish them from the United States. *See generally* Michael Walzer, *Spheres of Justice: A Defense of Pluralism and Equality* 16 (1983) (citizenship a primary social good).

Residence in the United States has many privileges, including protection against arbitrary deportation. While less extensively protected than full citizens, alien workers are in most respects treated as equal members of the community. The United States, unlike many other nations past and present, does not treat non-citizens as unworthy of full assimilation because of supposed ethnic differences and inferiorities. Children of alien parents, born within our borders, are eligible to fill the highest offices of the land. By and large, the United States has sought to act justly in our treatment of the foreign-born. *Id.* at 61. ("Political justice is a bar to permanent alienage. . . ."). It is a crime to subject an alien to different punishment from a citizen merely because of alienage. 18 U.S.C. § 242.

 Because Congress has chosen to place the power to deport exclusively with the Attorney General, courts have little to say on this subject. A district court's order restricting a criminal defendant's right to reenter or stay in the United States is improper to the extent that it assumes deportation or exclusion powers. *United States v. Olvera,* 954 F.2d 788, 793–94 (2d Cir.1992) (district court's deportation order could only constitute recommendation to Attorney General to institute deportation proceedings); *United States v. Jalilian,* 896 F.2d 447, 448 (10th Cir.1990) (although a court may "recommend . . . that an alien convicted of a crime of moral turpitude *not* be deported[,] [n]o statute provides . . . that a district court may recommend or . . . direct that an alien be deported.") (emphasis in original); *United States v. Abushaar,* 761 F.2d 954, 959 (3d Cir.1985) (condition that defendant serve probation outside the United States exceeds court's authority); *United States v. Hernandez,* 588 F.2d 346, 351 (2d Cir.1978) (district court's attempt to impose non-return to this country as condition of parole amounts to a direct deportation order and is not within its authority); *United States v. Castillo–Burgos,* 501 F.2d 217, 219–20 (9th Cir.) (order permanently deporting defendant exceeds the district court's authority), *cert. denied,* 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284 (1974).

*See generally* David E. Rigney, *Propriety, in Criminal Case, of Federal District Court Order Restricting Defendant's Right to Re-enter or Stay in United States,* 94 A.L.R.Fed. 619, 621–22 (1989).

 By statute, district courts retain the power to deliver a defendant to the INS for deportation hearings:

If an alien defendant is subject to deportation, the court may provide, as a condition of supervised release, that he be deported and remain outside the United States, and may order that he be delivered to a duly authorized immigration official for such deportation.

18 U.S.C. § 3583(d); *see United States v. Sanchez,* 923 F.2d 236, 237 (1st Cir.1991) (statute "simply permits the sentencing court to order, as a condition of supervised release, that 'an alien defendant [who] is subject to deportation' be surrendered to immigration officials for deportation proceedings under the Immigration and Naturalization Act."). The court also may require a defendant alien not to re-enter the United States illegally or without permission of the INS when such a requirement is a reasonable condition of the sentence. *United States v. Mercedes–Mercedes,* 851 F.2d 529, 530–31 (1st Cir.1988); *United States v. McLeod,* 608 F.2d 1076, 1078 (5th Cir.1979).

 A non-citizen defendant may waive his or her right to a deportation hearing before the INS and agree to leave the country as part of a negotiated plea. *United States v. Janko,* 865 F.2d 1246, 1247 (11th Cir.1989); *see also Mercedes–Mercedes,* 851 F.2d at 531 n. 3. No such agreement has been entered into here. This line of cases supports the court's authority to stay execution of a sentence should an alien illegally in the United States agree to depart promptly and voluntarily.

 Should the Attorney General's office pursue the matter, the INS may determine that some of the defendants are eligible for deportation under 8 U.S.C. § 1251(a)(2)(A)(i)–(ii). These statutory provisions call for deportation of any alien who (1) has received a prison sentence of at

least one year for a crime of "moral turpitude" within five years of that alien's entering the country or (2) who is convicted of two crimes of moral turpitude. The provisions read:

(i) Crimes of moral turpitude

Any alien who—

(I) is convicted of a crime involving moral turpitude committed within five years after the date of entry, and

(II) either is sentenced to confinement or is confined therefor in a prison or correctional institution for one year or longer,

is deportable.

(ii) Multiple criminal convictions

Any alien who at any time after entry is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.

8 U.S.C. § 1251(a)(2)(A)(i)–(ii).

■ Whether a crime involves moral turpitude is determined by the inherent nature of the crime as defined, rather than the circumstances surrounding the particular transgression. *United States ex rel. Sollazzo v. Esperdy,* 187 F.Supp. 753 (S.D.N.Y.1960), *aff'd,* 285 F.2d 341 (2d Cir.), *cert. denied,* 366 U.S. 905, 81 S.Ct. 1049, 6 L.Ed.2d 204 (1961). In the instant case the defendants have pled guilty to "theft and conversion" of United States government funds. The Second Circuit has held that theft is a crime of moral turpitude within the meaning of the immigration law. *Chiaramonte v. INS,* 626 F.2d 1093, 1097 (2d Cir.1980); *see also United States v. Villa–Fabela,* 882 F.2d 434, 439–40 (9th Cir.1989) (same). Accordingly, defendants have committed crimes of "moral turpitude" within the meaning of 8 U.S.C. § 1251(a)(2)(A)(i)–(ii). The defendants before the court who are legal resident aliens therefore will be deportable because of the instant pleas if they entered the country within five years or have been convicted of another crime of moral turpitude not part of this scheme.

Until 1990, sentencing courts were entitled to recommend to the Attorney General that aliens who were deportable because of criminal activity not be deported. Congress has since abolished that power. *See* 8 U.S.C. § 1251(a)(2)(A)(iv); *id.* (Historical and Statutory Notes) (abolishing 8 U.S.C. § 1251(b)(2)). The court would in any event refuse to recommend against deportation of any of the defendants potentially eligible for such punishment.

The United States Attorney shall take appropriate steps to bring these cases to the attention of the INS. Whether a defendant is deported will then depend upon decisions by the Attorney General and the INS. The INS is so overworked and underfunded that, as a practical matter, even defendants eligible for deportation may escape that penalty. *See* General Accounting Office, *Immigration Control: Deporting and Excluding Aliens from the United States* 5 (Oct.1989) (INS overburdened, although INS resources tend to be focused on deportation of criminals).

*2. Imprisonment, Probation, Community or Home Incarceration, Fines, Restitution, Community Service, Supervised Release.*

a. Sentencing Statutes

Under the Sentencing Reform Act of 1984, where Congress has not provided specific sentencing requirements in the substantive law defining a particular criminal offense, sentencing for an offense is governed by three related statutory provisions codified in Chapter 227 of Title 18 of the United States Code. While the exact contours of the scheme created by these provisions are less than crystal clear—the provisions even appear on superficial reading to be inconsistent—close analysis of the statutory pattern clarifies the powers and responsibilities of trial judges in sentencing.

■ The keystone, section 3551 of Title 18, mandates that the court impose sentences to achieve the general purposes listed in section 3553(a). Section 3551 reads in part:

Authorized sentences.

(a) In general.—Except as otherwise specifically provided, a defendant who has been found guilty of an offense described in any Federal statute ... shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

*Id.* As indicated below, the emphasis in section 3551 on subdivision (a)(2) of section 3553 and its failure to mention subdivision (b) have important implications in determining the effect of the Sentencing Guidelines.

The purposes listed in section 3553(a) include promoting respect for the law, achieving just punishment and general deterrence, protecting the public against recidivist crime and providing the defendant with needed rehabilitation and treatment. In addition to listing the overall purposes of sentencing, section 3553(a) enumerates six factors that courts must consider in sentencing. Applicable Sentencing Guidelines and pertinent Policy Statements of the Sentencing Commission constitute two of these six factors. The section reads:

Imposition of a Sentence

(a) Factors to be considered in imposing a sentence.

—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational train-ing, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the [sentencing] guidelines ... that are in effect on the date the defendant is sentenced;

(5) any pertinent policy statement issued by the Sentencing Commission ... that is in effect on the date the defendant is sentenced;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Finally, section 3553(b) of Title 18 provides further direction with respect to use of the federal Sentencing Guidelines. It states in relevant part:

The court shall impose a sentence of the kind, and within the range, referred to [by the Guidelines] unless the court finds that there exists aggravating or mitigating circumstances of the kind, or to a degree, not adequately taken into consideration by the Sentencing Commission....

18 U.S.C. § 3553(b).

There has been a tendency among the federal courts to ignore sections 3551 and 3553(a) by moving directly to section 3553(b). *See, e.g., Statement of Vincent L. Broderick and Mark L. Wolf to United States Sentencing Commission, reprinted in,* 4 Fed.Sent.Rep. 319 (May/June 1992) (noting Judicial Conference's rejection of proposal that Guidelines be made optional). This short-circuiting of the statutory scheme may be due to the natural tendency to focus exclusively on the Guidelines as a result of their novelty, the heated debate surrounding their enactment, the convenience to courts of being able to avoid consideration of the 3553(a) criteria in each case and the view of some in Congress and

elsewhere that harsher sentences were needed and that the Guidelines would provide a way to compel judges to impose them. It is, however, the statute as enacted, not the views of individuals, even those embodied in Congressional or Sentencing Commission reports, that we are interpreting. *Cf. Patterson v. Shumate*, — U.S. —, —, 112 S.Ct. 2242, 2250–51, 119 L.Ed.2d 519 (1992) (Scalia, J., concurring) (interpretations departing from statutory text undermine principle of government by laws, not persons).

The Sentencing Commission itself has tended to lose sight of the fact that it operates as part of a specific statutory scheme. As one of the drafters of the Guidelines' authorizing legislation has noted, the Commission has by and large failed to "aid the sentencing court in its consideration of the underlying purposes of sentencing [stated in the sentencing statutes] as a factor in the imposition of a particular sentence." Kenneth R. Feinberg, *The Federal Guidelines and the Underlying Purposes of Sentencing*, 3 Fed.Sent.Rep. 326, 327 (1991); *see also* Daniel J. Freed, *Federal Sentencing, supra*, 101 Yale L.J. at 1708–09. The lack of appropriate Commission guidance only increases the need for the sentencing court to heed the "carefully modulated tones" in the statutes and legislative history. Kenneth R. Feinberg, *The Federal Guidelines, supra*, at 325.

As already noted, sections 3551 and 3553(a) direct the trial judge to consider many explicitly articulated factors, only two of which directly implicate the work of the Sentencing Commission. The remaining factors were developed and incorporated by the legislature; they are obviously entitled to no less weight than those developed under the aegis of the Commission. To read section 3553(b) without regard to the fact that other provisions detail the congressional design would violate a "common-sense principle of statutory construction that sections of a statute generally should be read 'to give effect, if possible, to every clause.'" *Heckler v. Chaney*, 470 U.S. 821, 829, 105 S.Ct. 1649, 1654, 84 L.Ed.2d 714 (1985) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct.

513, 519, 99 L.Ed. 615 (1955)). "'[W]e must not be guided by a single sentence or member of a sentence, but look to the provision of the whole law.'" *Gade v. National Solid Wastes Management Ass'n*, — U.S. —, —, 112 S.Ct. 2374, 2384, 120 L.Ed.2d 73 (1992) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987)).

The legislative history of the Sentencing Reform Act does not shed much light on the relation between sections 3551, 3553(a) and 3553(b). *See* S.Rep. No. 98–225, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3257–62 (noting factors listed in § 3553(a)(2)–(3) & (a)(6)–(7) without explaining relation of factors to Guidelines).

Some language from the Senate Judiciary Committee suggests that the sentencing court ought to subsume sections 3551 and 3553(a) into section 3553(b) by considering how the purposes of sentencing and the five non-Guidelines related factors listed in 3553(a) affect the calculation of each sentence under the Guidelines. *See, e.g., id.* at 3258 (court should consider first factor listed in § 3553(a)—the nature and circumstances of the offense and the history and characteristics of the defendant—"in assessing how the sentencing guidelines and policy statements should apply to the defendant."); *see also* Daniel J. Freed, *Federal Sentencing, supra*, 101 Yale L.J. at 1702 ("with facts, purposes, and options clearly in mind, the sentencer [is] instructed to turn to [the Guidelines and Policy Statements].").

A reading of the statutes requiring attenuation of the force of section 3553(a) by merging it into section 3553(b) is supported neither by statutory language nor common sense. First, it ignores the grammatical structure of section 3553(a), which lists seven factors without ordering them in any kind of hierarchy. If Congress intended the inquiries under sections 3551 and 3553(a) to be merely part of each sentence calculation under the Guidelines, it is hard to see why it listed the Guidelines as but one among seven factors. Were Congress thinking along those lines, it most probably

would have captioned section 3553(a) with a phrase like: "Factors to be considered in applying the sentencing guidelines," rather than "Factors to be considered in imposing a sentence," and would have listed the other six factors under such a heading.

In addition, it must be kept in mind that, for the entire history of federal sentencing prior to the 1984 Act, judges exercised broad discretion in sentencing. The cautious, pluralistic language of sections 3551 and 3553 does not indicate a one hundred and eighty degree turn in sentencing practice. *See Feres v. United States*, 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950) (courts "cannot impute to Congress ... a radical departure from established law in absence of express congressional command.").

Most important, an attempted reconciliation of the three sentencing provisions at the expense of sections 3551 and 3553(a) fails; it does not allow courts to give meaningful consideration to all of the factors listed in section 3553(a). Because those factors do not count as relevant data under the terms of the Guidelines, a sentencing court can bring them to bear in its Guidelines calculations only in relatively trivial ways.

In cases such as those before the court, for example, one can envision several points in the sentencing process at which the considerations of section 3553(a) could come into play were the statutory pattern ignored: (1) in determining where within the Guidelines range a sentence should fall; (2) in determining (in the limited situations in which the Guidelines allow it) whether (a) probation is more desirable than incarceration or (b) a combination of imprisonment and home or community incarceration is preferable to imprisonment alone; and (3) in determining whether a departure is warranted. None of these contexts allows the court to give the non-Guidelines criteria of sections 3551 and 3553(a) the full consideration required by Congress.

A Guidelines sentence for a case like those now before the court is computed by calculating an "offense level," which is determined mainly by the amount of money a defendant steals, and then cross referencing the offense level with the defendant's criminal history. That calculation generates a recommended prison sentence, expressed in terms of a range of months. Assuming that the sentencing court is bound by the Guidelines, it must determine where within this range a given defendant's sentence will fall. Given that the typical case involves very small ranges—six months is common—the court's discretion is in practice minimal. While the task of translating the broad purposes of sentencing into an actual sentence is inevitably delicate, there is no indication that Congress went to the trouble of enumerating the factors in section 3553(a) only as a means of permitting fine distinctions between sentences. Deciding, for example, on incapacitation rather than rehabilitation in non-routine cases involves macro, not micro, decisions.

For a small spectrum of sentences at the low end of the Guidelines, courts have the option of considering probation rather than imprisonment or of mixing imprisonment with home or community incarceration. They are no doubt guided in considering these options by the section 3553(a) factors. Again, however, the statute nowhere suggests that the nature and circumstances of the offense and the characteristics of the defendant, the need for the sentence to achieve general and specific deterrence, promote respect for law, and assist in rehabilitation, the kinds of sentence available or the need to avoid sentencing disparities should be considered only in special cases involving relatively minor offenses.

Reflection on these factors and purposes could also conceivably assist courts in determining whether a departure from the Guidelines is warranted. Yet this is not what the statute calls for. Section 3553(b) instead establishes a separate test for appropriate *sua sponte* departures—the existence of aggravating or mitigating factors not adequately considered by the Commission—which does not echo or cross-reference the factors listed in section 3553(a).

A more compelling approach that gives effect to each of the statutory provisions is available by a straightforward reading of the three provisions in order, applying them in three steps. As a first step, under sections 3551 and 3553(a), the court must consider how, given the circumstances of the case, the various purposes of sentencing can best be served. It is aided in this inquiry by considering whether any or all of the seven factors listed in section 3553(a) are applicable and what their relative weight should be.

As part of this first-step inquiry, courts must determine whether the Sentencing Commission's Guidelines and Policy Statements ought to control a given case to the exclusion of all other factors. In this regard, courts will tend to rely on the Guidelines where the case is typical of many like situations and is susceptible to the statistical analysis and compilation techniques used by the Commission in developing the Guidelines. *See* United States Sentencing Commission, *Guidelines Manual* 5 (Nov. 1991) ("The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes."). The experience of trial judges in determining whether a case is run-of-the-mill or presents unusual problems or local variations necessarily will inform this decision.

If the conclusion of the first-step analysis is that the Guidelines and Commission Policy Statements ought to apply to the exclusion of other factors, the court proceeds to the second step, which is to follow the directive of section 3553(b) and apply the Guidelines and Policy Statements according to their terms. In this endeavor the court will look to the published work of the Commission, seeking to construe the terms of the current *Guidelines Manual* to determine the appropriate Guidelines sentencing range.

The court's third step is to consider (a) the sentencing options provided, if any— e.g., imprisonment or probation—and (b) whether any exceptions recognized by statute or the Guidelines themselves apply— e.g., not adequately considered aggravating or mitigating factors.

Even in a case where the court must sentence under step one because the Guidelines do not control, it will be desirable in many instances to go through steps two and three so that the court can reconsider its step one conclusion by checking it against the national averages in the closest analogous cases. Given the great power of the sentencing court to affect the lives of the people before it, as well as a wide circle of relations and others and society as a whole, and given the lack of any precise method for determining *the* just sentence in any particular case, humility in the *nisi prius* court is essential. It must look not only to the legislative scheme and general principles justifying punishment, but to the views of other judges, the Sentencing Commission's statistical analyses and judgments, the arguments of counsel, the Probation Office's guidance, the judge's own heart and experience, and, finally, the oversight of a panel of appellate judges. In addition, the Eastern District of New York has a practice by which the sentencing judge may consult with a panel of two other judges in the district, a practice utilized in the instant cases. This elaborate process for checking the particular sentencing judge's views can moderate and protect against the extremes of error, but cannot promise perfection. *See, e.g.,* Yoram Shachar, *Sentencing As Art, supra,* 25 Isr. L.Rev. at 661 ("we must settle for intuition and frequent disparity"); Mordechai Kremnitzer, *Sentencing As Art—A Response: Sentencing as a Just System, id.* at 662. Despite the conceptual and practical difficulties, the court may not avoid decision. Congress, sensitive to the tentative and uncertain nature of the enterprise, has wisely directed the courts to impose sentences "not greater than necessary." 18 U.S.C. § 3553(a).

In some instances, the trial court will not need to go beyond step one. For example, if the defendant is an extremely dangerous person, the concern of section 3553(a)(2)(C) to protect the community may override all other purposes and call for incapacitation for the maximum term permitted by law.

The Guidelines would then be irrelevant. To avoid wasted effort by the Court of Appeals in considering details of steps two and three when they have no bearing, the trial court should usually indicate on which of the factors in section 3553(a)(1), (2), (3), (6) and (7) it is relying. Usually, of course, the district court's rationale will be obvious to the Court of Appeals from the record.

The Supreme Court's statement in *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), that the Sentencing Reform Act created guidelines that are "binding" on courts does not counsel against adopting the interpretation that flows most naturally from the statutes' pattern and plain language. The Court wrote:

> [The Sentencing Reform Act] makes the Sentencing Commission's guidelines binding on the courts, although it preserves for the judge the discretion to depart from the guideline applicable to a particular case.... §§ 3553(a) and (b).

*Id.*, 488 U.S. at 367, 109 S.Ct. at 652. *Mistretta* concerned the constitutionality of Congress's delegation of powers to the Sentencing Commission. The above sentence appears in the opinion as part of a background thumbnail sketch of the Guidelines as a means of highlighting the delegation and separation of powers questions facing the court—it presents what the Court considered to be the typical sentencing scenario under the Guidelines. As the citation to section 3553(a) and (b) as a unit makes clear, *Mistretta* did not confront the issue now before the court of the proper interpretation of sections 3551 and 3553 or of the relation between Guidelines and non-Guidelines sentences.

Statutory provisions detailing the duties and powers of the Commission, *see* 28 U.S.C. §§ 991–95, do not address the question of how Article III judges are to use the Commission's product in sentencing. Nor is there anything in the remainder of section 3553 or in surrounding provisions in Chapter 227 that casts doubt on the need of the court to consider all the factors listed in § 3553(a) before deciding to follow the Guidelines. Section 3553(d), like section 3552, deals with presentence reports and procedure. Section 3553(e) requires a motion by the government before a court may sentence below a statutory minimum. Section 3553(c) requires the court to state the reasons for choosing a point within or outside a Guidelines range "*if* the sentence" is predicated on the Guidelines. *Id.* (emphasis added).

Other related provisions in Chapter 227 do not bear directly on the application of the Guidelines. *See* 18 U.S.C. § 3554 (forfeiture order); *id.* § 3555 (order of notice to victim); *id.* § 3556 (restitution order); *id.* § 3557 (review of sentence; cross-referencing § 3742 governing appeals); *id.* § 3558 (implementation of sentence); *id.* § 3559 (classifying offenses).

18 U.S.C. § 3742, governing appellate review of sentences, does emphasize appeals of Guidelines sentences. It could be argued that, where a sentence is not imposed pursuant to section 3553(a)(4) and (5) there is no power to review it—i.e., the sentence should be treated as it was prior to the Sentencing Reform Act, with no appellate review of sentences. Such a sharp distinction between Guidelines and non-Guidelines sentences for purposes of appeal would create intractable appellate jurisdictional issues and is unwarranted by the overall language of the section, particularly since sections 3742(a) and (b) have general clauses permitting review of any sentences "imposed in violation of law." Since the section 3553(a) factors are so interrelated, an assumption by the Courts of Appeal of the power to review all sentences, whether or not imposed under the Guidelines, is sound. Nevertheless, the Courts of Appeal have interpreted their role narrowly, essentially restricting themselves to checking the district courts' math, and properly leaving basic judgments as to the justice of individual sentences to the trial courts. *Cf.* Haim H. Cohn, *On the Immorality of Punishment*, 25 Isr.L.Rev. 283, 299–300 (1991) ("In the same way as sentences of trial judges are mere guesswork as to what justice really demands, so are the conclusions of appellate courts mere guesswork (and the guesses are not necessarily better.)") (citing Jerome Frank, *Courts on Trial* 157 (1973)).

In undertaking the three-step approach outlined above, the court should explore all relevant sources of information as mandated by section 3661 of Title 18:

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

When many defendants are sentenced at once, the court must be especially careful to minimize disparities. Such caution is directed by 18 U.S.C. § 3553(a)(6).

In the cases now before it, the court has thoroughly explored the factual background of the crimes and of each defendant. It has carefully observed each defendant in court on repeated occasions in the company of friends, relatives, children and attorneys, and has questioned each in detail about her criminal acts and her background. Each of the factors set out by Congress in section 3553(a), including Sentencing Commission Guidelines and Policy Statements, has been considered in arriving at each defendant's sentence. The sentences imposed have required emphasis on the criteria set forth in 18 U.S.C. § 3553(a)(1), (2)(A), (B) & (D), (6) and (7): general deterrence and rehabilitation in that order, are, as noted in this memorandum, the overriding concerns of the court.

### b. Sentencing Guidelines

Even though the Guidelines are not controlling in these cases, the court finds it useful to "consider," *see* 18 U.S.C. § 3553(a), together with all the other pertinent factors, the Sentencing Guidelines and the Sentencing Commission's Policy Statements. The Guidelines suggest offense-specific terms of imprisonment, probation with terms and conditions, supervised release, fines, restitution and payment of costs of imprisonment or probation.

The prison sentences deemed relevant to these defendants' offenses by the Guidelines are considered below with respect to each individual defendant. As an alternative to prison, probation is provided as an option under the Guidelines if the minimum term of the relevant punishment required by the Guidelines is less than or equal to six months. For Guidelines prison terms of greater than one month but not more than six months, a sentence of probation is generally permitted, but the court must impose probation for a specified period of time up to five years, *see* United States Sentencing Commission, *Guidelines Manual* § 5B1.2 (Nov. 1991), and only if it imposes a condition or conditions on the probation of confinement to one's home or community facilities for a period at least as long the relevant minimum prison term. *Id.* § 5B1.1 (Application Notes, 1(b)). Combinations of imprisonment and home detention or confinement in a community treatment facility are permitted and are described in connection with each defendant's case, *infra. Id.* § 5C1.1(c), (d), (e).

The Guidelines and sentencing statutes also provide for terms of supervised release. Imposition of supervised release is mandatory except in cases where the defendant is sentenced to a prison term of one year or less, in which cases it is discretionary. *Id.* § 5D1.1 *et seq.* The period of supervised release is determined either by the terms of the statute under which a defendant is convicted or by the class of felony or misdemeanor which the defendant has committed. In the instant cases, supervised release terms of up to three years are permitted. This means that after a defendant is released from prison she is under the Probation Department's supervision. Violations of the terms of supervised release can result in re-imprisonment.

The Guidelines provide for restitution of ill-gotten gains in accordance with underlying statutory law. *Id.* § 5E1.1. In addition, they contain a table for the imposition of fines that corresponds to each defendant's offense level. *Id.* § 5E1.2.

### c. Departures From the Guidelines

Even in those instances when the Guidelines are of predominant importance compared with the other governing criteria set forth in section 3553(a), courts are authorized to depart from them under certain conditions. Under § 5K1.1, the government may suggest that the court depart

downward because the defendant has "provided substantial assistance in the investigation or prosecution of another person who has committed an offense." The court has discretion to grant such a request. In other circumstances, a court should depart from the Guidelines if it "finds that there exists an aggravating or mitigating circumstance, of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines...." 18 U.S.C. § 3553(b). A non-exhaustive list of such grounds for departure, either upward or downward, is provided in § 5K2.0 et seq. of the Guidelines (e.g. crime resulted in death or injury, crime provoked by victim). That section, however, must be read in light of § 5H1.1 et seq., which enumerates various factors relating to the character of the defendant that a court normally ought *not* consider bases for departing (e.g., age, education, race, gender).

■■■ An important issue in the cases now before the court is the relevance of a defendant's status as a single mother, particularly where the children are young or have special medical problems and the defendant is responsible for their custody. The Sentencing Commission's Policy Statement § 5H1.6 reads in part: "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." This statement applies primarily to considerations of incarceration: the Policy Statement goes on to add that "Family responsibilities that are complied with may be relevant to the determination of the amount of restitution or fine." As a Policy Statement, § 5H1.6 is merely advisory. *See* Daniel J. Freed, *Federal Sentencing, supra,* 101 Yale L.J. at 1732.

The policy statement of section 5H1.6 is not useful in the present situation. It tells us that a defendant-mother is not generally entitled to credit for her motherhood. It does not address the more critical problem of whether the court can consider the welfare of her child or children in determining the sentence. In this instance, it would be especially ironic if the court could not do so when the very program the defendant abused is for the benefit of children. The government is, as the AFDC name suggests, concerned with aid for dependent children, not dependent mothers. Aid is given to the mother to assist her in caring for the child. Insofar as the absence of the mother may have profoundly deleterious effects on her child or children, their care must be relevant in considering whether there should be incarceration or other forms of punishment.

Although not addressing identical concerns, Judge Sweet came to the conclusion that a downward departure would be considered where a defendant was the sole care provider of her two teenage children. *United States v. Gerard,* 782 F.Supp. 913 (S.D.N.Y.1992). Rather than impose a sentence within the Guidelines range of 33 to 41 months, the court in *Gerard* placed the defendant on probation for five years and required her to make restitution. *Compare United States v. Johnson,* 964 F.2d 124 (2d Cir.1992) (downward departure approved for defendant upon whom infant and three young children depend) *and United States v. Joyner,* 924 F.2d 454, 459–61 (2d Cir.1991) (departure affirmed where imprisonment of defendant "might well result in the destruction of an otherwise strong family unit") *with United States v. Carr,* 932 F.2d 67 (1st Cir.) (dependency of children not basis for departure), *cert. denied,* —— U.S. ——, 112 S.Ct. 112, 116 L.Ed.2d 82 (1991) *and United States v. Brand,* 907 F.2d 31 (4th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 585, 112 L.Ed.2d 590 (1990) (same) *and United States v. Brewer,* 899 F.2d 503 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990) (same).

In many of the defendants' families there has been a succession of adult males, almost all of whom have renounced any connection with or obligation to the children. Removing the mother in such a matriarchal setting destroys the children's main source of stability and guidance and enhances the possibility of their engaging in destructive behavior. *Cf. United States v. Leasehold Interest in 121 Nostrand Avenue,* 760

F.Supp. 1015, 1022 (E.D.N.Y.1991) (noting matriarchal structure of extended family). Experience in this district has demonstrated that imprisonment of a parent tends to result in the child ending up in prison as well. Even incarceration within the community and forced work for the community without pay is bound to have some adverse effects on the child. Nevertheless, these consequences cannot be entirely avoided. While the sins of the mother should not be visited on the child, the child may learn from her experience that crime does not go unpunished.

The court would have ordered incarceration of some defendants in a community treatment facility with the child or children accompanying the mother in cases where this sentence would be appropriate. There are, however, no correctional facilities in the New York metropolitan area which allow children to live with their parent.

### 3. Denial or Limitation of Future Benefits

 The court has a circumscribed role in denying or limiting future receipt of welfare payments by a mother convicted of welfare fraud. The reasons are both pragmatic and statutory.

As a practical matter, AFDC is intended primarily to benefit children: parents who receive funds essentially act as caretakers and guardians within the family setting. When putting provisions on the table, the law cannot realistically deny a mother the opportunity to share a meal with the children. Although many parents have practiced such selflessness, no sane government policy could mandate and enforce this degree of self-denial in the home.

Under the Social Security Act, 42 U.S.C. § 601 *et seq.*, a state may secure the return of improperly received public assistance funds from a person still on assistance through recoupment, i.e., deductions from the client's legitimate welfare payments. Recoupment is limited by the statute to ten percent of these payments. 42 U.S.C. § 602(a)(22); 45 C.F.R. 233.20(a)(13). New York State's AFDC implementing statute and regulations mirror the federal statute except that they impose a five percent recoupment ceiling in cases where the recipient can prove undue hardship. *See* Soc. Serv.Law § 106–b; NYCRR § 352.31(d).

The Social Security Act does grant to the states the power to amend their AFDC programs so as to discount the needs of any individual within an AFDC family who has been found by a

> Federal or State court or pursuant to an administrative hearing ... to have intentionally—
>
> > (1) made a false or misleading statement or misrepresented, concealed, or withheld facts, or
> >
> > (2) committed any act intended to mislead, misrepresent, conceal, or withhold facts or propound a falsity, for the purpose of establishing or maintaining the family's eligibility for [assistance]. . . .

42 U.S.C. § 616(b). Persons committing an offense under this statute may have their needs discounted for six months. Persons who commit two such offenses may be cut off for twelve months, and third offenders may be barred permanently from obtaining payments.

On April 2, 1992, the Governor of New York signed into law an amendment to Social Services Law § 145–b. *See* Chapter 41 of the Laws of 1992. This amendment permits the disqualification of recipients who fraudulently secure public assistance. The court has been informed by HRA that the State has forwarded or will soon forward to the Secretary of Health and Human Services an amendment to the State's AFDC plan to include this section. *See Letter from Associate General Counsel, Human Resources Administration, to Court* (June 18, 1992).

The New York law contains an additional protection for welfare recipients not found in the federal statute. It states that no individual shall be sanctioned after a plea of guilty to welfare fraud unless he or she was advised on the record of the disqualification provisions that may apply prior to the entry of the plea. *See* Soc.Serv.Law § 143–c(4).

States are granted similar powers to suspend Food Stamp payments to those who intentionally defraud the program. *See* 7 U.S.C. § 2015. An additional provision in the Food Stamp program specifically allows for court-imposed suspensions of benefits for up to 18 months. That power, however, is granted only for commission of felonies and misdemeanors defined in the Food Stamp statute itself. The provision, 7 U.S.C. § 2024(b)(1), reads in part:

[W]hoever knowingly uses, transfers, acquires, alters, or possesses coupons, authorization cards, or access devices in any manner contrary to this chapter ... shall ... [be guilty of a felony or misdemeanor]. In addition ... any person convicted of a felony or misdemeanor violation under this subsection may be suspended by the court from participation in the food stamp program for an additional period of up to eighteen months consecutive to that period of suspension mandated by section 2015(b)(1) of this title.

*Id.* Since these cases have not been brought under section 2024, the suspension power would seem not to apply.

▮▮▮ A person's removal from the public assistance rolls does not vitiate his or her obligation to make restitution for overpayment. 42 U.S.C. § 602(a)(22)(B). Enforcing restitution by requiring a defendant in a criminal proceeding to sign a confession of judgment satisfies this obligation. It also avoids the unnecessary expenditure of additional public funds to secure enforcement through a plenary action. A stipulation filed in the United States District Court, Southern District of New York in *Perez v. Dumpson,* 75 Civ. 1603 (S.D.N.Y. Jan. 18, 1980), permits taking a confession from a person who is still in receipt of assistance.

▮▮▮ In view of the complex statutory and administrative regulations for dealing with welfare payments for those convicted of welfare fraud, it would be inappropriate for the court to further intrude itself into welfare administration. To assist the government, however, it is appropriate to require a confession of judgment as a condition of probation as permitted by *Perez v.*

*Dumpson.* Accordingly, in each instance where probation is granted, as a condition of probation the Probation Department of this court should require an appropriate confession of judgment up to the amount of restitution ordered by the court. Signing the confession of judgment does not constitute payment of restitution. Any payments of restitution in whole or part shall be deemed a payment under the confession of judgment. Any payment under the confession of judgment and any recoupment under New York or federal law shall be deemed a payment of restitution.

### *4. Modification of Sentences*

Within one year of imposition, sentences may be modified if, based upon further cooperation, the government recommends a change. *See* Fed.R.Crim.P. 35(b). Absent government action the court may modify the sentence only within seven days of imposition for clear error, *id.* Rule 35(c), or at any time on order of the Court of Appeals. *See* Rule 35(a). As indicated in Part V, *infra,* probation terms may be modified as required during the probation period.

## III. INDIVIDUAL SENTENCES

### A. General Considerations

▮▮▮ The extended allocutions conducted for each defendant indicate the inherent difficulty of sentencing in these cases. The defendants who have children have each displayed a strong maternal feeling of responsibility for them. Generally, the children appear to be as well cared for as economic and social circumstances allow. Those who came to court demonstrated a reciprocal concern for their mothers' welfare. All were neatly dressed, respectful and distressed at their parents' predicament. Since in almost every case the defendant is the main stabilizing force in her children's domestic lives, they are naturally deeply concerned that their own futures will be compromised should they be separated from their mother for any substantial period of time. Most, however, do not fully comprehend the dangers they and

their mothers face as a result of the mothers' criminal behavior.

One mother, typical of the group, shook with fear at the possibility that prison would wrest her from her children. Her two older daughters, both teenagers, sat behind her. The family had come for the allocution directly from the younger child's junior high school graduation, which took place on a beautiful June day. When the family arrived, the older sister and the graduate—still clad in a white robe and sporting a medal for her accomplishments in English classes—displayed the high spirits of two young, successful women looking forward to future accomplishments. The mother, by contrast, quailed at the prospect of having to leave these children without her guidance in a crime and drug-ridden section of the Bronx. In tears, she expressed in plain terms the dark irony of her situation: the crime that was intended to help her family now threatened to destroy it. The young women, once aware of their mother's terror and sorrow, began to sob.

The grim courtroom in which the defendants appeared is in an inspiring stone-clad courthouse surrounded by parks now in the prime of greenery and bursting with floral color. The courthouse is located in an urban community whose problems, reflected in the court's docket, are typical of those experienced in inner cities everywhere. Although it takes place in a sterile controlled courtroom, sentencing cannot be divorced from its setting. It is the sharp juxtaposition of the abstract and sometimes arid rules of law and the complex individuals and physical realities of the world outside the courthouse that makes these sentences so poignant and difficult.

The court's consideration of prison sentences was affected by its knowledge of the operation of the federal prison system. Given that overcrowding causes defendants to be sent to far flung locations, any prison term imposed on these defendants would likely have to be served in a place where family visitation would be almost impossible. Defendants would be thrown in with drug "mules" and habitual criminals of sharply different economic and cultural backgrounds from their own. Despite the fact that many of the defendants have lived with a number of men in an unmarried state, these women are not now promiscuous. They seem · to have sought stable relationships. Most are middle-aged, conservative women, primarily housewives, who have never been involved in crime and who have worked at menial jobs out of economic necessity and with little concern for their own careers or egos. Their probable cellmates would likely surprise, dismay and terrorize them.

The value of incarceration in community treatment centers depends in part on the nature of the facilities available. Part V, *infra*, offers a brief description of possibilities pursued by the Probation Department of this District. By the time all of the fifty-five defendants involved in this scheme have been sentenced, all available community facilities will be needed. As with imprisonment, community incarceration raises the problem of separating mother from children, many of whom would be left with little supervision in dangerous areas of New York City.

Detention in the home is of limited utility when the mother's tasks require her to be in and out of the house to attend to caretaking and job requirements. Moreover, in some cases the apartments in which they would be confined are more bleak and overcrowded than even prison cells. Any reasonable inhibitions on leaving the home could have little effect on the necessary coming and going of these defendants, who are not likely to be leaving the house for parties, theater or vacations abroad.

Fines and restitution are in the main futile since the defendants, with perhaps one exception, are without assets and are unlikely ever to earn more than a subsistence wage. Yet, as indicated in the individual sentences, tying credits for restitution to paying jobs may well serve rehabilitative ends. This technique may also encourage defendants to free themselves from welfare dependence—a desired public policy goal. *See, e.g.,* Judith M. Gueron, *Reforming Welfare with Work* (Occasional Paper 2, Ford Foundation Project on Social Wel-

fare and the American Future 1987); *cf.* N.Y. Times, Jan. 10, 1992, at A1 (welfare caseloads increasing dramatically). The problem of gainful employment is particularly difficult in view of the depressed New York economy.

■■■■ Community service is a useful alternative in some instances. In the cases before the court it is decidedly less desirable than encouraging paid employment. Extended terms of community service beyond 240 hours are of questionable value. Norval Morris & Michael Tonry, *Between Prison and Probation* 168 (1990). Here, many defendants have been assigned 1,000 hours of service, but with offsets for gainful employment to promote self-sufficiency.

Some of the sentencing alternatives used individually and in combination will be controversial. Yet the special conditions faced by the court in sentencing this first group of twenty defendants, with many more to follow, requires innovation. The court is fortunate to have the services of a highly competent Probation staff to help defendants improve their lot. As problems arise in the execution of these sentences—as they surely will—the court may modify probation and supervisory release terms as needed. *See* Part V, *infra*.

B. Defendants

*1. Martha Concepcion, CR 91-781*

Ms. Concepcion was born in 1954 in Nicaragua. She is a citizen of that country and a permanent resident alien in the United States. She defrauded the government of $110,831 using five aliases. During the course of the fraud she paid cash bribes to a welfare worker.

The Guidelines for this case call for ten to sixteen months in prison, or five months in prison plus five months community confinement or home detention. Defendant cooperated with the government. Her information about the whereabouts of a key defendant has led the government to recommend a downward departure.

Ms. Concepcion was reared in Nicaragua in a close knit family with two siblings. They were financially secure and well edu-

cated, the father being employed as an engineer for Mercedes Benz. The family immigrated to the United States in 1970 because of political unrest in Nicaragua. Except for defendant, it returned to Nicaragua because of the difficulty the father had in obtaining secure work in this country.

The father apparently later died in military action in El Salvador and the remainder of the family returned to Miami and then went on to Winnipeg, Canada as refugees. The brother is a medical doctor and the sister a furniture designer; both live in Winnipeg. Defendant's mother, although fifty-five years of age, is a student in a medical school in Winnipeg.

The defendant remained in this country because she had married. She was granted permanent residency in 1973. The defendant's first husband was a member of the United States Air Force. They had two children, one now fourteen and one sixteen, who reside with the defendant and are attending school in New York City. Defendant is divorced. Her first husband also resides in New York City. He is a hospital engineer and helps provide for the children.

A second marriage resulted in a separation. Two children, one age nine and one age six, were born of this union and they continue to reside with defendant. The second husband furnishes support intermittently.

The defendant is in good health. She is educated. She had a private tutor and graduated from high school in Nicaragua. In this country she attended a beauty school and has been licensed as a hair dresser and cosmetologist. She has worked as a hair cutter in her home and is capable of earning a living.

The four children are of an age when they need their mother's guidance. The two fathers who live in the metropolitan area are not ready to undertake this supervision. Nor are the matrilineal relatives in Canada capable of keeping the four children together and under supervision. The family now lives in a poor area with security and drug problems in the Bronx. Her

two older daughters are adolescents who obviously need full supervision to avoid the dangers rife in their environment.

■ Imprisonment far from home would harm the children, yet some form of incarceration seems necessary for deterrence. Defendant is sentenced to five years probation, the first six months of which shall be served in home detention. Defendant may leave only for work, shopping, care of the children, religious services and as permitted by Probation. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation, in order to protect the children, and for the other reasons set forth in this memorandum.

■ A $50 assessment is imposed. Restitution of $110,831 is ordered, payable as Probation directs. Probation shall arrange for restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If the defendant is gainfully employed earning income for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment defendant is to receive a credit of $10 towards the bill for restitution. These provisions are designed to strongly encourage gainful employment. While the court has no power to order that defendant not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment.

This defendant has received welfare for fourteen years even though she and her husbands were capable of supporting the family without government assistance. She can work and her children can help care for each other while she is at work. She should support herself with the aid of her former husbands. Probation should insist on appropriate assistance from them for the children.

### 2. Ana Morillo, CR 91–821

Ms. Morillo was born in the Dominican Republic in 1949 and remains a citizen of that country. She is a legal resident alien in this country. She used five names to obtain $38,588 in payments of welfare and food stamps. She shared these payments with the persons who recruited her and provided the necessary forged documents.

The Guidelines for this case are six to twelve months imprisonment. A term of three months followed by three months of community confinement or home detention may also be imposed. Probation is possible with community or home confinement for six months. Because of the defendant's cooperation, the government has recommended a downward departure.

Ms. Morillo married in Santo Domingo. Two of her children, now seventeen and fifteen, were born there. The three joined the defendant's husband, a taxi driver, in the United States. A third child, now eight, was born a United States citizen. The family seems stable. It resides in a sparsely furnished, $111 per month two-bedroom apartment in a poor Bronx neighborhood.

Defendant's four siblings have immigrated to the United States and also reside in the Bronx. The defendant's formal schooling ceased in the fifth grade in the Dominican Republic. She did attend school for a short time in a New York City school program to learn English. Despite her lack of formal education she appears to be a bright person who was able to work as a physical education teacher in the Dominican Republic. In this country she has been employed in various factories in the Bronx and Long Island City and as a customer service representative in an export-import business in New Jersey. Currently she is working as a domestic, cleaning private apartments and earning approximately $375 each month. Her children can care for each other while she works.

The defendant is placed on five years probation, with three months to be served in a community treatment center with provision to leave for work and family emergencies. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation, in order to protect the children, and for the other reasons set forth in this memorandum. With the aid of Probation, the extended family in the Bronx should be able to help supervise the children during the period of incarceration.

The defendant is ordered to pay a $50 assessment and is directed to make restitution of $38,588 as directed by Probation. Probation shall arrange for the restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If the defendant is gainfully employed earning income for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment defendant is to receive a credit of $10 towards the bill for restitution. These provisions are designed to strongly encourage gainful employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment.

### 3. Jane Arendell, CR 91–822

■ Ms. Arendell was born in 1968 in Manhattan and is therefore an American citizen. She defrauded the government of $88,691 in four cases, claiming three dependents in each, although she has only one child. In addition, she received $1,395 in Medicaid benefits. After being apprehended she lied to a probation officer by failing to mention two of her four phony cases. In addition, she failed to cooperate with the government because she did not want to implicate her two sisters. The government recommends that there be no departure and that this defendant be sentenced to the high end of her Guidelines range.

The Guidelines for this case are ten to sixteen months in prison followed by two to three years of supervised release. Alternatively, the court may impose a term of imprisonment of five months, followed by supervised release with a special condition of five months of home or community confinement.

Defendant's mother had already had three children in the Dominican Republic born of two separate relationships before she moved to New York City. Defendant and her brother are the fruit of a third relationship. Defendant's mother entered the United States legally, but her father was an illegal alien, subsequently arrested and deported. Her mother never remarried and has worked since 1985 in a doll factory at $160 per week; the mother suffers from high blood pressure.

Defendant married when she was nineteen but soon separated from her husband. Her involvement with another man for six months led to the birth of a son, now eighteen months old. The son receives speech therapy. No support is provided by either man.

Together with her brother, mother and child, defendant lives in a three bedroom apartment in Harlem, which the family has occupied for seventeen years. The rent is $288 per month.

Defendant's formal education stopped at the eleventh grade when she dropped out of school. She has completed a six-month course as a nurse's aide and claims to have worked as a salesperson and dispatcher for a car service company, but no verification can be obtained from an employer. No income tax returns were ever filed. Although she admits to having "experimented" with marijuana and cocaine, defendant claims she does not now use either drug, and she shows no signs of being a regular user. Her health is good and she seems

intelligent, personable and capable of working.

Complete separation from her infant child for a long period would be likely to cause considerable harm to the child. Defendant's mother already seems overwhelmed. Defendant's twenty-two year old brother is seldom home since he works in Massachusetts. Her half sisters, however, could assist if defendant were incarcerated in a local facility which permitted the child to visit and the defendant to work and spend some time at home. Some form of incarceration as a warning to others seems necessary.

The defendant is sentenced to five years probation, the first year of which shall be served in a community treatment center. The defendant shall be permitted to leave during the day for work and as emergencies at home require. The Probation office shall arrange for temporary custody of defendant's child if required. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in order to protect the child and for the other reasons set forth in this memorandum.

A $50 assessment is imposed. Restitution of $90,086 is ordered, payable as Probation directs. Probation shall arrange for the restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If the defendant is gainfully employed earning income for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment defendant is to receive a credit of $10 towards the bill for restitution. These provisions are designed to strongly encourage gainful employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment.

Defendant is capable of supporting herself and her child. She should work. The father of her child, rather than the public fisc, should help support the infant. Probation should insist on appropriate support from him. Some form of child care while defendant works needs to be arranged.

### 4. Dinorah Caba, CR 91–844

Ms. Caba was born in the Dominican Republic. She is a citizen of that country and is an illegal alien. She applied for benefits using assumed identities and used false documentation in four cases to steal $44,713 in benefits and food stamps. While she lied when first arrested, she ultimately told the truth and cooperated fully with the government, implicating an HRA employee. The government has moved for a downward departure. Defendant appears to be remorseful and has fully accepted responsibility for her acts.

The Guidelines for this case are eight to fourteen months in prison. The court may also provide four months of imprisonment followed by supervised release with a special condition requiring four months of community or home confinement.

In Santo Domingo defendant was raised by her mother along with five other children. Her mother supported the family by washing clothes and cleaning houses while her father lolled in the streets. The defendant dropped out of high school to enter into a liaison which resulted in the birth of three children in the Dominican Republic. In 1980 she left her children with her sister in Santo Domingo and immigrated to the United States through Puerto Rico. In this country she has been self-employed as seamstress living in an unmarried state for the last eight years with the father of her fourth child, now eight years old. This child, like the other three, was born and now resides in Santo Domingo with defendant's sister. The man works as a building superintendent and operates a tire shop. He apparently plans to marry the defendant. The two live in a sparsely furnished apartment in Harlem.

Three of the defendant's five siblings have immigrated to the United States and reside in the metropolitan New York area. They appear to be employed with stable relationships and they and the defendant apparently send money to the Dominican Republic to help support the family there.

Except for a stomach ulcer and high blood pressure for which medication is taken, defendant appears to be in good health. Despite her lack of schooling she appears to be bright and capable. She presently earns about $1,000 a month and sends money for her four children in Santo Domingo, but she pays no taxes on any of this income. In view of the stable life she has established in this country and the income she can earn as a seamstress, as well as her cooperation, imprisonment away from New York City is not desirable. Defendant, as already noted, is an illegal alien. The court sees no reason why she should not be deported.

Defendant is sentenced to five years probation and ordered to pay restitution of $44,713 and a $50 assessment. Deterrence requires that three months of probation be served in a community treatment center with leave to work. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation, in order to protect the children, who depend in part on the defendant for support, and for the other reasons set forth in this memorandum.

Probation shall arrange for the restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If the defendant is gainfully employed earning income for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment defendant is to receive a credit of $10 towards the bill for restitution. These provisions are designed to strongly encourage gainful employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment. Probation shall attempt to obtain support from one or more of the fathers of defendant's children.

Upon deportation or her voluntary emigration, defendant's term of incarceration and restitution obligation will be stayed.

### 5. Anna Vega, CR 91–845

Ms. Vega is an American citizen born in 1956 in Brooklyn. She received almost $65,000 in bribes while she worked for HRA and thereby facilitated the crimes of numerous other defendants. Since 1986 she has helped open about two hundred fraudulent cases that have cost the public over one million dollars. While she cooperated with the prosecutor initially, Ms. Vega lied and refused to appear for debriefing when requested to do so. The government recommends "a lengthy sentence by virtue of her substantial participation and central position in the schemes."

At allocution, after a *Fatico* hearing, it was established that the appropriate Guidelines range for this case is forty-six to fifty-seven months. A supervised release term after imprisonment of up to three years is also to be imposed.

The defendant is the oldest of four children. After his discharge from the army, her father became a drug addict who stole from the family's home to support his habit. He subsequently died of AIDS. Defendant's mother is in a coma after surgery for cancer. One of defendant's siblings works for HRA. A sister, who lives with the defendant, has a history of psychiatric illness. Another sister is a drug addict and lives on the streets. As the oldest of the siblings, defendant has taken responsibility for this largely dysfunctional family.

When defendant was nineteen she married. The couple had two children, now thirteen and fifteen. The couple divorced,

and the husband, who is a soldier, pays a total of $235 in support each month. Defendant has for the last ten years been involved with a man who has been unemployed since 1986. They live with defendant's two children in Brooklyn, paying $390 per month for an apartment with no indication of luxury.

Between 1982 and 1991 defendant worked for HRA as an Eligibility Specialist in an office in East New York at a salary of $23,000 per year. When she lost her job with HRA following her arrest, defendant began to receive welfare payments of $514 in cash and $274 in food stamps each month. Her health is good.

Defendant is an intelligent and sensitive young woman who has displayed two very different sides to the government. According to those conducting her debriefings, she indicated a desire to gain vengeance against document vendors who had profited from her help and an intention to "steal [the welfare system] blind" at the first opportunity. Ms. Vega denied making the latter statement, but a *Fatico* hearing established by clear and convincing evidence that she had, perhaps in frustration at her own self-destructive behavior. In contrast, according to her presentence report, defendant is contrite, often waking up in the middle of the night "feeling like a cheap criminal" and wondering how she permitted herself to become involved in these crimes. Her main concern now appears to be making arrangements for someone to look after her children while she serves her sentence.

 Incarceration away from home will adversely affect the children. Defendant may lose custody if she serves more than two years. *Cf. United States v. Pokuaa*, 782 F.Supp. 747, 748 (E.D.N.Y.1992) (loss of custody upon mother's incarceration probable). Nevertheless, the seriousness of the offense, and the need to send a pointed warning to welfare workers, requires a long prison term.

The defendant is sentenced to three years in prison. A longer term would cause unnecessary deterioration to both defendant and her family. This term will not,

under present statutes, be subject to shortening by parole. Defendant must also serve three years of supervised release following her prison term. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in order to protect the children and for the other reasons set forth in this memorandum.

 A mandatory assessment of $50 is imposed. The government claims that restitution of the $65,000 in bribes that defendant took can be imposed. That is not clear, however, since the bribes were paid by others whose restitution includes the bribe money they paid. Accordingly, in lieu of restitution, a fine of $65,000 is imposed. Because of the period of imprisonment, provision for community service is inappropriate.

### 6. Lourdes Arias, CR 91–846

Ms. Arias is a naturalized American citizen who was born in 1961 in the Dominican Republic. Beginning in October 1987, using various aliases and forged Social Security cards and other false identification, she opened five welfare cases receiving a total of $81,752 in AFDC and Food Stamp payments. She claims that she shared about one-half of the proceeds with her co-conspirators who helped her obtain false documents. She also recruited two of her sisters into the scheme. The three sisters are responsible for more than $228,000 in welfare frauds. She gave no cooperation and the government does not recommend a downward departure.

Her Guidelines range is ten to sixteen months in prison and up to three years supervised release with restitution of $81,-752 and fines of $3,000 to $30,000. The cost of imprisoning her would be $1,492 a month; the cost of probation with supervised release would be $115 a month and the cost of community confinement would be $991 a month.

The defendant's father was an iron worker in Santo Domingo earning a good living. Her mother abandoned the defendant when

she was two years old and moved to Puerto Rico and eventually to New York City, where she gave birth to two additional children by a man with whom she no longer lives. Her mother continues to live in New York and works as a seamstress.

Defendant was raised by her father and paternal grandmother in Santo Domingo. At the age of seventeen, after completing one year of high school in Santo Domingo, defendant joined her mother in New York. In 1983 she became a naturalized citizen and married an illegal alien. Her husband has been employed in a variety of menial jobs for the past five years earning about $250 a week. He has been granted residence status under the Amnesty Program so that he is now legally in the United States. Three children have been born from this union, one twelve, one six, and one eight months old. The older children attend the Holy Name Parochial School requiring that the family pay tuition of $190 monthly. The six-year-old requires therapy paid for by Medicaid. The family lives in a $150–per–month sixth floor walk-up apartment in upper Manhattan. While the building is in disrepair, the apartment is reasonably well kept, but overcrowded with stereos and other furniture and electronic equipment bought with the money stolen from the government.

■ Upon arrival in the United States the defendant attended a secretarial school for about eighteen months in a state sponsored program and obtained a high school equivalency diploma. She has earned thirty-three credits from Hostos Community College of the City University of New York with a cumulative grade point average 2.6 out of a possible 4.0. She has been employed in various factories but following the birth of her first child has not worked except intermittently "off the books" for a travel agency helping clients obtain immigration documents. She is a naive but pleasant and cooperative individual with limited English language skills. Although she is somewhat immature, her effort at education and a stable marriage with an employed husband indicate a capacity to maintain a lawful and positive lifestyle.

Since she and her three sisters have shared the burdens of caring for mutual children, work is possible. All sisters should not be incarcerated at once. At the request of Probation, suitable stays will be provided so that service of terms away from home can be arranged.

■ The young child, and defendant's sincere regret over her involvement in the crime, as well as the unusual stability of the family relationship—stability absent among many of the other defendants in this series of crimes—suggest that imprisonment away from New York City would be unnecessarily destructive. Defendant is sentenced to five years probation with three months in a community treatment center. She should be permitted to leave for work and family emergencies. The extended family and father can help manage the children. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in order to protect the children and for the other reasons set forth in this memorandum.

Defendant is required to pay a $50 assessment. She is ordered to pay $81,752 in restitution. Probation shall arrange for the restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If the defendant is gainfully employed earning income for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment defendant is to receive a credit of $10 towards the bill for restitution. These provisions are designed to strongly encourage gainful employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment.

### 7. Esperanza Lara, CR 91–847

Ms. Lara was born in 1953 in the Dominican Republic. She is a lawful permanent resident of the United States. She received $91,674 in seven cases in which she used fraudulent papers and pseudonyms. Substantial amounts were paid by her in bribes and she split part of the money and food stamps with document vendors.

The Guidelines range for this case is ten to sixteen months. As an alternative a term of imprisonment of five months can be imposed followed by five months of community or home confinement. In view of her full cooperation and the need for her testimony at a trial, the government has recommended a downward departure.

Defendant was one of seven children. The rest of the family remains in the Dominican Republic but their relations remain close; defendant and her children have flown to visit them about ten times and defendant's mother flies to New York on occasion.

Defendant completed the eleventh grade in the Dominican Republic. She worked as a nurse's assistant in that country. At the Bronx Community College she completed a two-day home attendant course and she has been certified as a home attendant. She has worked in that capacity for two years and also worked for six months in a factory. She paid taxes on her income. Defendant is in good health and can work if care can be obtained for her two children.

The defendant has been married and divorced twice. One of her two children was born in wedlock. She and the two children live alone in an apartment. One child, six, attends public school. The other, aged five, will start school in the Fall. Both are healthy. Neither of the fathers furnishes support. Defendant has been on welfare for nearly seven years although she appears to be capable of earning a living. Since she has been obtaining welfare fraudulently she has made no attempt to work.

Incarceration in a prison far from home would be harmful to the children. Home detention and community incarceration are not practical in view of defendant's need to be with the children; there is no man or nearby extended family in the picture.

Ms. Lara is sentenced to five years probation, and ordered to pay a $50 assessment and restitution of $91,674. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation, in order to protect the children, and for the other reasons set forth in this memorandum.

Probation shall arrange for the restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If the defendant is gainfully employed earning income for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment defendant is to receive a credit of $10 towards the bill for restitution. These provisions are designed to strongly encourage gainful employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment.

Probation will need to help defendant arrange for child care so that she can work. It shall also attempt to obtain support from the children's fathers.

### 8. Mayra Collado, CR 91–848

Ms. Collado was born in the Dominican Republic in 1965. She is a naturalized citizen. She maintained three fraudulent cases with the HRA, obtaining a total of $33,348 in illegal payments.

The Guidelines for this case are six to twelve months in prison. Probation with six months community or home confinement is permitted. Because defendant furnished important information to the government, it requests a downward departure.

Defendant's parents were married. While they are divorced and remain in the Dominican Republic they have maintained a stable economic base. The father is employed as a candy maker while the mother has remarried and earns a living selling clothing. One brother was arrested on drug charges and is presently a fugitive. The other brother lives in New York and is an unemployed windowshade maker.

The defendant was seventeen when she married and moved with her husband to the United States. She divorced her first husband because of physical abuse to both herself and their daughter, now eleven. She was remarried in 1985 but was divorced because of that husband's drug use. She has an eight year old daughter by the second husband and a two year old son by a former boyfriend. No father contributes support to any of these three children. She gave birth to a fourth child in April of this year by another boyfriend who works as a gypsy cab driver. He helps support their son but does not live with defendant. All four children live with defendant. While defendant's mother, fifty-two years old, lives in the Dominican Republic, she probably would be able to help care for the children if defendant were incarcerated or had to work.

Defendant's health is good except for her treatment for tuberculosis in 1989 which appears to have been successful. She graduated from Mercy College in 1987 with an Associate Degree in accounting, having maintained a "C" average. She worked at a number of "off the book" positions as a secretary and accountant, but she has refrained from ever filing an income tax return. Although she is capable of working, defendant receives welfare and has done so for the past ten years.

There appears to be good reason not to incarcerate defendant in view of her young child and the absence of extended family support in New York to take care of her infant while she is in prison. Defendant is sentenced to five years probation and ordered to pay restitution of $33,348 and a $50 assessment. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation, in order to protect the children, and for the other reasons set forth in this memorandum.

Probation shall arrange for the restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If she is gainfully employed in a job for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment she is to receive a credit of $10 toward the bill for restitution. These provisions are designed to strongly encourage employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment. Probation shall attempt to obtain support from the fathers of defendant's children.

### 9. Maria Ramirez, CR 91–902

Maria Ramirez was born in the Dominican Republic in 1954. She is still a citizen of that country, but also a permanent legal resident of the United States. She stole $34,686 using two aliases.

The relevant Guidelines call for six to twelve months in prison, or a prison term of three months followed by three months of home or community confinement. Because of her substantial assistance to the government, it has suggested a downward departure.

Defendant was one of eleven children all born in the Dominican Republic. Her father was a farm worker and her mother a homemaker. Most of the family moved to New York, including defendant, who accompanied her father here in 1971.

Defendant married in 1972 but was divorced without having lived with her hus-

band. In 1975, while still married, she commenced a ten year relationship with her brother-in-law. Two children, one now fifteen and one ten, were born of this liaison. Both attend public school. The father furnishes no support. Defendant and the two boys live in a two bedroom project apartment in Washington Heights. Rent has been $140 per month, but will increase because defendant is now working. Modest furnishings were purchased with part of the stolen money.

Seven of defendant's siblings and her mother are in New York and, in view of the family's closeness, can help care for the children. Her theft notwithstanding, defendant is a devoted Catholic who harbored considerable guilt for her crimes which she expressed to her priest before and after she was apprehended. She kept about $11,000 for herself, but claims to have expended the entire amount on her sons by purchasing such items as separate beds, sneakers, clothes and the like. Defendant appears to be a genuinely devoted mother.

Ms. Ramirez and her children are in good health. She has a seventh grade education from the Dominican Republic. Since September 1991, she has been enrolled in the Displaced Homemaker Program of Bronx Community College where she is studying at night for a high school equivalency diploma. From 1971 to 1981 she held various factory jobs but she cannot locate tax returns she claims to have filed. She has received public assistance since 1981.

Defendant's health, her close knit extended family and the age of her children make it possible for her to hold a job. Since March of this year, she has worked for pay for the Selfhelp Community Service Home Attendant Corporation in the Bronx. In April, her public assistance case was closed. Her attorney reports that, as a result of her employment, she has now retrieved her dignity and "won the admiration of her two sons."

Incarceration in a prison far from home would be harmful to the children, yet some incarceration seems necessary for deterrence. Defendant is sentenced to three years probation, the first three months of which shall be served in a community treatment center. She should be permitted to leave for work and for family emergencies. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation, in order to protect the children, and for the other reasons set forth in this memorandum.

A $50 special assessment is imposed. Restitution of $34,686 is ordered. Probation shall arrange for the restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If she is gainfully employed in a job for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment she is to receive a credit of $10 for restitution. These provisions are designed to strongly encourage employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment. Probation shall attempt to obtain support from the fathers of the children.

### 10. Patria Mercedes, CR 91–936

Ms. Mercedes was born in the Dominican Republic in 1962. She is a naturalized citizen of the United States. Her pre-sentence report, as amended in light of information obtained in the ongoing DOI investigation, indicates that she opened three fraudulent cases, obtaining $61,356 in those cases and sold fraudulent documents to others which were used in obtaining $74,583. At a *Fatico* hearing, however, the amount of loss attributable to defendant was reduced by $33,270 on evidence that Ms. Mercedes was not involved in one particular sale of documents. Defendant was both a recruiter

and a general liaison within the ring of suppliers of fraudulent identification documents although she had no managerial functions in the conspiracy. She escorted a number of women to DSS centers and actually delivered bribe money to an HRA employee.

The Guidelines for this case, adjusted upward to reflect the information provided by the ongoing DOI investigation and downward to discount the one case that was determined at the *Fatico* hearing not to be attributable to the defendant, would entail imprisonment for ten to sixteen months. Alternatively, defendant may be ordered to serve five months in prison followed by five months of community or home confinement. Because the defendant lied and failed to cooperate fully, the government does not seek a downward departure.

An only child, defendant was reared in a modest home in the Dominican Republic. When she was eight her parents separated. Her father has since died as a result of alcoholism. She has twelve half-siblings through relationships her father maintained with various women before, during and after his marriage. The father became a resident in New York in 1977. He assisted the defendant, then fifteen years old, in moving to New York and taking up residency with one of her half-sisters. Defendant's mother, who remains close to her, now lives in New York as do a number of defendant's siblings.

Although she had been a bright student up to her junior year in high school in the Dominican Republic, defendant never registered for school in New York City. She did, however, obtain a general equivalency high school diploma when she was seventeen. She married when she was eighteen while she was studying at Bronx Community College and working part-time at a fast food restaurant. Thereafter she divorced, dropped out of college and established a relationship with her present husband. She had one child with him in August 1984. Her husband joined the United States Army and she lived with him in Germany. During the war with Iraq she returned to New York. She presently lives with her husband in a two bedroom apartment provided rent free by the United States Army.

Defendant suffers from sickle-cell anemia, as does her son. She is nevertheless capable of work. Her husband has $20,000 in savings bank accounts accumulated from periodic payroll deductions offset by debts. Her mother and extended family can help care for her son.

█ The government suggests a stiff sentence to reflect defendant's role as a document vendor. Her sister-in-law is the head of a document selling ring who fled to the Dominican Republic. Although the government's position is justified, the state of health of the child and the defendant, as well as the stable family life provided by the father suggests that imprisonment far from home is not desirable. Nevertheless, for reasons of general deterrence, a substantial period of incarceration is necessary.

Defendant is sentenced to five years probation and a $50 assessment. The first year of probation shall be served in a community treatment center. She should be permitted to leave for work and family emergencies. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in light of the health of mother and child and for the other reasons set forth in this memorandum.

Defendant is ordered to make restitution of $61,356. Probation shall arrange for the restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If she is gainfully employed in a job for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment she is to receive a credit of $10 toward the bill for restitution. These provisions are designed to strongly encourage employment. While the court has no pow-

er to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment by defendant and her husband.

### 11. Georgina Cepin, CR 91–937

Ms. Cepin was born in 1961 in the Dominican Republic. She is still a citizen of that country although she is a legal resident alien of this country. She stole $23,336 using six fraudulent names at a time when she had no children and was ineligible for Aid to Families with Dependent Children. Ms. Cepin was arrested twice in 1986 for possession of gambling records and each time paid a fine.

Defendant agreed to cooperate and implicated various document vendors but also falsely denied knowing a major document vendor who is still at large. The government has refused to recommend a downward departure from the Guidelines. They provide for six to twelve months in prison or three months in prison with three months of community confinement.

Ms. Cepin's mother and father were married and were stable economically. Her father, who owns a cheese factory, has remained in the Dominican Republic with seven of the defendant's eleven siblings while the others live in the metropolitan New York area, as does her mother. Her mother is now receiving Social Security disability payments.

The defendant entered the United States in 1976. She was wed for about two months. After separating, she cohabited with a gypsy cab driver for eight years. She is now separated from him. He threatened her to induce her not to implicate her boyfriend's brother in this conspiracy.

In April of this year, defendant gave birth to her first child, a son, by another man with whom she is no longer living. That man is not providing support. During the period when she was fraudulently obtaining welfare payments she had no children.

Defendant completed high school. She has taken a variety of trade courses in secretarial and beautician schools. She has worked as a cashier at a number of grocery stores and at a beauty shop, all of her employment being off the books so that she has never filed income tax returns. She owes $4,000 on her student loans, $3,000 for furniture and has other debts including $900 to a health club. In view of the large number of siblings present in the metropolitan area, arrangements can be made for the care of her son while she is in prison.

Although her criminal record is not serious, when combined with her deliberate cover-up of knowledge as to the identity and whereabouts of a documents vendor, a term of imprisonment is warranted. While her son is an American citizen, the presence of numerous siblings in this country and in the Dominican Republic provides some assurance that he could be cared for either here or there during the period that defendant is in prison. Defendant would prefer to move back to the Dominican Republic where her father, who has a large house and his successful company, would care for her and the child.

Defendant is sentenced to nine months in prison and three years of supervised release. Restitution of $23,336 and a $50 assessment are ordered. The sentence imposed is required by statute in the court's informed discretion. The sentence also falls within the applicable Guidelines range. Probation shall arrange for the restitution payments so as to permit sufficient income for the family. It shall also attempt to obtain support from the father.

In view of the prison sentence, no provision for community service is needed. If defendant leaves this country promptly and voluntarily, the prison sentence, supervised release term and order of restitution will be stayed. There is good reason not to require taxpayers to pay the cost of $1,492 per month for imprisonment or $115 per month for supervised release. Having left the country, she shall not return illegally.

### 12. Maria Baez, CR 91–1100

Ms. Baez was born in the Dominican Republic in 1955. She remains a citizen of

that country. She is an illegal alien who has overstayed a six-month visitor visa granted in 1974. Defendant participated in the opening of nine fraudulent welfare cases collecting benefits from each of them. She received $71,221 in cash and food stamps and almost $9,000 in Medicaid benefits. She has given no assistance to the government in these cases and has lied about details of her crime.

The Guidelines range is fifteen to twenty-one months in prison. The government recommends no downward departure.

The defendant came to New York eighteen years ago, living first with an aunt and then with her boyfriend when he arrived from the Dominican Republic. The couple had two sons, now twelve and sixteen, both of whom were born in this country. The father provides no support. The younger child lives with defendant's father and his wife in Santo Domingo. The older child lives with defendant and is reported to be doing well in school. If defendant were to return to the Dominican Republic, as she states she is willing to do, she and her two sons would live with her father.

Up until the time she began her fraudulent welfare scheme defendant worked at a variety of factory jobs in food preparation and in a beauty parlor. She also sold meat and vegetable pies made at home. She has had two years of high school.

There appears to be no reason not to provide for a period of prison in this case. With the aid of relatives with whom they now live, defendant's sons are capable of subsisting for a short time without her presence.

Defendant is sentenced to one year in prison, three years supervised release and a $50 assessment. She is ordered to make restitution of $80,177. Probation shall arrange for the restitution payments so as to permit sufficient living income for the family. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure to protect the children and for the other reasons set forth in this memorandum. A sentence of fifteen months, as provided in the Guidelines, would be deleterious to both defendant and her children yet would add little to deterrence and would unduly burden taxpayers.

The court finds no reason why the defendant should not be deported upon termination of her prison sentence. Upon her being deported, as a condition of supervised release she may not return illegally to this country. Should defendant voluntarily agree to leave the country forthwith, the prison sentence, supervised release term and order of restitution will be stayed. Taxpayers should not be burdened with the cost of her incarceration and supervision, which is estimated as $1,492 per month for prison, and $115 per month for supervised release. Deportation is punishment enough. In view of the term of incarceration, no provision for community service is needed. Probation shall attempt to obtain support from the father.

### 13. Griselina Ogirri, CR 91–1194

Ms. Ogirri was born in the Dominican Republic in 1950 and remains a citizen of that country. She is a legal resident alien in the United States.·

This defendant is one of the most culpable of the people involved in this scheme. She worked for the United States Social Security Administration for more than twelve years. She used this experience to produce and distribute hundreds of counterfeit Social Security cards and Puerto Rican birth certificates. Her motivation appears to have been greed. She and her husband lived in an expensive home in Yonkers with a rent of $2,850 per month. They own four cars, including two Cadillacs. She has defaulted on her student loan and obtained a United States passport fraudulently.

The defendant obtained $32,448 in three fraudulent cases of her own. Those she assisted through the selling of phony documents defrauded the government of $1,353,533. Government investigators have identified forty-two individuals who received multiple sets of identification documents from the defendant. They opened

a total of 60 fraudulent welfare cases. Generally, the defendant charged $600 to $800 for a set of documents, but sometimes she sold them for more than $2,000.

The Guidelines range in this case is thirty-seven to forty-six months imprisonment. The government moves for a downward departure based on defendant's significant assistance. The defendant has done everything requested of her by the government and has been debriefed on a number of occasions. Her information has contributed to the arrest of four individuals. She has also identified about a dozen others who have not yet been arrested.

Ms. Ogirri is the last of seven children born of a marital union in the Dominican Republic. Some of her siblings remain in that country while others live in Puerto Rico and Florida.

The whereabouts of defendant's first and second husbands are unknown. Two children were born of the first marriage. One, age twenty, is employed as a porter in Florida. The other, age eighteen, is also in Florida. The second husband is a citizen of Nigeria. He and the defendant had five children, ages ten, nine, eight, six, and seven months. Since her release on bail, defendant has lived with her younger five children and a sister in Florida.

Ms. Ogirri is in good health. She completed her secondary school education in Puerto Rico and earned a Bachelor of Arts degree in City College where she majored in sociology. She has been employed almost continuously since then, earning $17,000 per year from the federal government. The government has not determined the location of her assets except for four cars and a one-half ownership of a house in Florida with a substantial equity.

■ The punishment provided by the Guidelines is adequate in light of defendant's abuse of her government position. Had she not cooperated, the court would have provided a sentence greatly in excess of the Guidelines range for purposes of generally deterring government employees from participating in frauds of this kind. Defendant is sentenced to forty-six months in prison and three years supervised release.

The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a sentence at the upper end of the Guidelines. It should be noted that the court originally intended to impose a four year sentence on the basis of 18 U.S.C. § 641, which allows for a prison sentence of up to ten years, but reduced the term to forty-six months because the increment of general deterrence value would be minimal and because it was appropriate to consider the conclusions of the Sentencing Commission even where statute, rather than the Guidelines, controls. See Part II B 2 a, *supra*.

Restitution is ordered in the amount of $32,448, which is the amount defendant obtained directly. Restitution in the other cases she assisted with could be ordered but it is more efficient to order restitution in each individual's cases. In view, however, of the damage caused by the defendant's activities and the possibility that she has substantial assets secreted, a fine of $75,000, which is within the Guidelines range for fines of $7,500 to $75,000, is imposed, to be collected as Probation directs.

The prison term will undoubtedly have severe adverse effects on the defendant's children, some of whom are quite young. Defendant's siblings seem capable of providing some care. Probation shall assist in providing suitable custody during the period of incarceration. In view of the incarceration, no provision for community service is warranted.

Should defendant's cooperation continue, the government may move for a departure under Rule 35 of the Federal Rules of Criminal Procedure. At the government's request, Ms. Ogirri's sentence is stayed for two months.

### 14. Sonia Jiminez, CR 91–1254

Ms. Jiminez was born in 1948 in the Dominican Republic. She remains a citizen of that country although a legal resident alien in the United States.

The defendant opened five fraudulent welfare cases and collected benefits of $39,572 in cash and food stamps. She divided this money with a recruiter. The Guidelines range for this case is six to twelve months. Alternatively, the court may impose a term of imprisonment of three months followed by three months of community or home confinement. The government moves for a downward departure based on defendant's cooperation.

Defendant was one of two children born to parents who were subsequently divorced. The father worked in a sugar processing factory. She was raised with a brother by her father and stepbrother.

The first of defendant's two children is now seventeen; she graduated from high school as a "B" student this month and plans to attend Westchester Community College. This child was born of a relationship outside of marriage in the Dominican Republic. The father has provided no support. The second child is two years old and resulted from an ongoing relationship of approximately three years with a responsible person who lives in Ossining with defendant's two children and his own son, sixteen, from a previous relationship. This family is upset over the disgrace that defendant has brought on it. The family resides in an upper middle class area in Ossining paying $1,100 monthly rent.

The man in the family is able to supply funds for the household. The defendant herself has worked in the past for substantial periods of time at a jewelry factory in New York City. She is currently working full time in a jewelry factory at a wage of more than $8 per hour. While she has had only an eighth grade education, the defendant appears competent to earn a living while she provides private care for her child.

The defendant is sentenced to four years probation. A $50 assessment is ordered as is restitution of $39,572. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation, in order to protect the children, and for the other reasons set forth in this memorandum.

Probation shall arrange for the restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If she is gainfully employed in a job for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment she is to receive a credit of $10 towards the bill for restitution. These provisions are designed to strongly encourage employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment. Probation shall attempt to obtain support from the father of the first child.

### 15. *Calidad Mack, CR 91–1265*

This defendant was born in the Dominican Republic in 1946. She is a Dominican citizen and a resident alien of this country.

Ms. Mack used six names in her own personal applications for fraudulent welfare payments and received $68,288 in these cases. She prepared many other sets of fraudulent documents. A total of $368,953 was obtained using documents that she falsely prepared and sold. Defendant received portions of the benefits of the twelve women who have to date stated that they received fraudulent documents from her. It is not known how much defendant received when she purchased false documents from others and resold them for cash and one-half of the money received as a result of their use. The amounts, however, are substantial. Defendant recruited eight other women to commit fraud. She sold phony cases that she had started to other vendors.

 According to the Probation Department's calculations, the Guidelines range

for this case is eight to fourteen months or four months imprisonment followed by four months of home or community detention. At allocution, the government pointed out that, under Guidelines § 2B1.1(b)(1)(L), the correct range is eighteen to twenty four months. The facts support the government's higher assessment.

A *Fatico* hearing was held in which the government proved by clear and convincing evidence that Ms. Mack obstructed justice by aiding the flight of a major codefendant and by lying to the government after agreeing to cooperate. These findings support the government's view that a downward departure request is unwarranted.

In addition to obtaining a high school diploma in Puerto Rico, defendant has completed a beauty academy program. She worked in a beauty salon until she began receiving income from her frauds. Since being cut off the welfare rolls, she now manages a restaurant at $300 a week. She is a highly competent entrepreneur having established her own beauty salon in the San Juan area.

Defendant's first marriage, which resulted in the birth of a child, now nineteen, lasted a short time, as did her second marriage, from which a second daughter was born. The younger child, an asthmatic, is now ten. The older is attending college. Defendant and her children live in a $150–a–month one bedroom apartment in the Bronx. No support is provided by the fathers. The younger child's father has visitation rights that are sometimes exercised, although a protective order has been issued because of his violence.

Defendant has two full brothers and seven half-siblings in the Dominican Republic with whom she maintains contact. Her children were born in the United States and are American citizens. Given the age of the children it is expected that they will be able to assist each other with the aid of the extended family while the defendant is incarcerated.

In view of the extensive nature of the defendant's activities in undercutting the welfare system and her lies, which protected other members of the conspiracy, the defendant is sentenced to eighteen months in prison. The sentence imposed is required by statute in the court's informed discretion as well as by the Guidelines. It should be noted that this is the sentence that would be imposed whatever the appropriate Guidelines range, since an absence of more than a year and a half would be too harmful to the children and a sentence of less time would deprecate the crime.

A $50 assessment is imposed. Ms. Mack is also sentenced to three years supervised release and ordered to make restitution of $68,288, the amount received directly in her own cases. The amounts received by other people should be obtained as restitution in their cases. While a substantial fine would be justified in this case, there is no point in assessing it since it would be uncollectible. In view of the incarceration, no provision for community service is needed.

Probation should arrange for the custody of the younger children in the Dominican Republic by paying necessary transportation costs for both children to and from the Dominican Republic or by paying for a suitable relative to obtain transportation to this country after obtaining a temporary visa. The children's school year should not be interrupted. A stay of execution to permit completion of the school year and custody arrangements will be granted if needed. Probation should attempt to obtain support from the fathers.

### 16. *Flavia Polanco, CR 91–1267*

Ms. Polanco was born in the Dominican Republic. She remains a citizen of that country although a legal resident alien in the United States. She stole a total of $111,023 using five false names. She made payments of between $700 and $1,500 to open each case and split the welfare benefits with a recruiter.

The Guidelines for this case are ten to sixteen months in prison. Alternatively, imprisonment for five months followed by five months of community or home detention is permitted. Because of defendant's

extensive cooperation, the government has recommended a downward departure.

Defendant's father and mother are divorced; both are retired workers who live in New York and collect Social Security. One of defendant's sisters resides with the defendant and is a co-defendant in this case. A self-supporting brother and a stepsister on welfare also reside in New York. Defendant has had four children from three different men. One child is sixteen years old, the others are ten, five and two. The three younger children are American citizens.

The father of defendant's first child lives in Santo Domingo and has provided no support. The father of the second child is in the United States; he also provides no support. Ms. Polanco married the father of her last two children. He is receiving disability compensation as a result of an injury he incurred while employed as a cabinet maker. Defendant's sister lives with her. While they pay only $113 a month for their two bedroom apartment in a poor section of the Bronx, it is well-furnished with a large-screen TV and expensive stereo equipment.

The defendant has no substantial medical problems. While she has only a fifth grade education, she is bright and able to work. When she first arrived in this country in 1977, she was employed as a waitress in several restaurants. Since 1982, when she began to receive illegal welfare payments, she has not sought employment.

Incarceration far from home is contraindicated both by the age of defendant's younger children and by the need to habituate defendant to paid employment after her long period of surviving on ill-gotten public assistance.

The defendant is sentenced to five years probation. The first four months of her probation shall be served in home detention. Home detention in this case, while awkward, is more desirable than community detention since there is a responsible male in the home who can help support defendant and the children. The defendant shall be permitted to leave during the day for work, shopping, care of her children, medical treatment and religious services as Probation directs. In determining living arrangements and custody, the Probation office shall be mindful of any problem raised by defendant's husband sharing an apartment with his sister-in-law.

The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation, in order to protect the children and for the other reasons set forth in this memorandum.

Defendant is ordered to make restitution of $111,023 and to pay a $50 assessment. Probation shall arrange for the restitution payments so as to permit sufficient living income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If defendant is gainfully employed in a job for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment she is to receive a credit of $10 toward the bill for restitution. These provisions are designed to strongly encourage employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment. Probation shall attempt to obtain support for the children from their respective fathers.

### 17. Marilyn Perez, CR 91–1268

Ms. Perez was born in the Dominican Republic in 1963. She remains a citizen of that Republic. She is an illegal alien.

This defendant stole $51,480 in three cases and $609 in Medicaid benefits. Her Guidelines range is eight to fourteen months in prison or four months in prison followed by four months in home or community confinement.

Defendant lied to Pretrial Services and lied to Probation. Subsequently, however, she admitted her lies and cooperated fully, implicating a document vendor and assisting the government. The government has moved for a downward departure.

Defendant has been a hotel receptionist and a retail sales person. She now sells cosmetics door to door and appears capable of earning a living.

Ms. Perez has no children and there was no economic pressure for her to steal from the government. She married a United States citizen in April. Her husband delivers meat as an over-the-road truck driver. He makes as much as $1,200 a week when working. The couple now lives in a rented room in the Sunset Park section of Brooklyn. Two brothers and two sisters live in the New York area. She has a full high school education.

The defendant is placed on five years probation. She is required to serve the first twelve months of the probation period in home detention. She may leave home only to work, for medical treatment, religious services or as permitted by Probation. Home detention is practicable in this case because of the absence of children. The cost to taxpayers of detention in a community treatment center would be $991 per month whereas probation and home confinement costs only $115 per month. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation.

In addition, defendant is ordered to make restitution of $52,089 and to pay an assessment of $50. Probation shall arrange for the restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If she is gainfully employed in a job for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such

employment she is to receive a credit of $10 towards the bill for restitution. These provisions are designed to strongly encourage employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment.

Upon her deportation or voluntary prompt departure, defendant's obligation to serve in home confinement and pay restitution will be stayed.

### 18. Elvira Garcia, CR 91–1282

Ms. Garcia was born in the Dominican Republic in 1959. She remains a citizen of that country but a legal resident of the United States.

The defendant opened four fraudulent accounts using assumed names. She received $198,419 in AFDC money and food stamps and $2,398 in Medicaid benefits. About one-half of the money and food stamps was taken by the vendors of the false documents that the defendant used. She has cooperated fully. Her cooperation has led to the arrest of a significant number of sellers of documents and she has agreed to testify at upcoming trials.

The Guidelines range is twelve to eighteen months in prison and supervised release of up to three years. The government recommends a downward departure.

The defendant is the youngest of five children, all born in the Dominican Republic. The family was abandoned by the father shortly before her birth. Although he was employed as a mason, he did not support the children. The mother then married a truck driver who has supported and has given stability to the family for the past thirty-two years.

The defendant graduated from high school in the Dominican Republic. She then married a Dominican who had been visiting from New York City and moved to New York with him. For a time they were both employed, but he stopped working and the family lived off her salary earned as a

packer in a tablecloth factory. They were divorced.

The defendant has shown some ambition, taking classes in English and mathematics at the LaGuardia Community College while working nearby at a Long Island City watch factory. She remarried and abandoned her studies, apparently to avoid marital problems, but continued to work until shortly before she began receiving illegal welfare payments in 1986. She has one five year old child by her second husband. The child is not supported by her husband, from whom she is separated.

Since she was dropped from the welfare rolls in 1991, Ms. Garcia has worked as a kitchen helper in a restaurant and in a cafeteria in Manhattan. The defendant is in good health and there is no reason why she cannot continue to earn at least her present wages of $190 weekly.

Custody of defendant's child presents a serious problem. Defendant's siblings reside in either the Dominican Republic or in Massachusetts. There is no one in the extended family who can care for the child while defendant is incarcerated either in prison or in a community treatment center. Home detention is impractical in view of the age of her son and her need to work. Her present arrangements for child care with a neighbor while she works are probably adequate, but they need to be investigated by Probation.

Defendant is sentenced to five years probation. Restitution of $200,817 is ordered and a $50 assessment is imposed. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation, in order to protect the child, and for the other reasons set forth in this memorandum.

Probation shall arrange the restitution payments to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation as being unduly burdensome in a particular period. If she is gainfully employed in a job for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment she is to receive a credit of $10 toward the bill for restitution. These provisions are designed to strongly encourage employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment. Probation shall attempt to obtain support from the father.

### 19. Rosario Lopez, CR 91–1283

Ms. Lopez is an American citizen born in Puerto Rico in 1952. She defrauded the government of $28,826 in food stamps and AFDC payments and $1,082 in Medicaid benefits using three pseudonyms and false documents.

The Guidelines range is six to twelve months imprisonment or three months imprisonment followed by three months of home or community incarceration. Although defendant lied about her true identity following her arrest, she did provide considerable assistance to the government. It has moved for a downward departure.

Ms. Lopez has three children. One of them, nineteen, dropped out of school and is doing odd jobs around the neighborhood. The others are twelve and six. All live with the defendant. Each child is from a different father, none of whom provide support. She was married to the fathers of the first two children.

Defendant has a high school diploma. She has been employed from time to time receiving untaxed income selling merchandise on the street. She may be the least culpable of all of those involved because she did not keep most of the money. In fact she tried to have her cases closed shortly after they were opened but was misled into believing that they had been terminated. Whatever she did receive was paid to a landlord who was threatening to evict her. She presently lives in a sparsely

furnished apartment in a poverty stricken area of the Bronx. She is diabetic.

Defendant is placed on probation for two years. Restitution of $29,908 is ordered payable as Probation directs and a $50 assessment is imposed. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation, in order to protect the children, and for the other reasons set forth in this memorandum.

Probation shall arrange for the restitution payments so as to permit sufficient income for the family. During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in some particular period. If she is gainfully employed in a job for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment defendant is to receive a credit of $10 towards the bill for restitution. These provisions are designed to strongly encourage employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment. Probation will attempt to obtain support from the fathers of defendant's children.

### 20. Mercedes Peralta, CR 92–264

Ms. Peralta was born in 1953 in the Dominican Republic. She remains a citizen of that Republic but is a legal resident alien.

Defendant stole $29,481 in welfare and food stamps from the government using two false names. She paid bribes and split about one-half of the payments with a vendor of false documents. The Guidelines range for this case is six to twelve months imprisonment or three months imprisonment followed by three months of home or community detention. Defendant has given substantial assistance to the government. It recommends a downward departure.

The defendant was born under impoverished circumstances in the Dominican Republic. She remained there with her parents until she was twenty-five when she immigrated to the United States where her younger sister had already secured citizenship. Her parents eventually moved to New York.

Defendant married in 1978 and one child, age twelve, was born of that union. She was then divorced. A relationship with another man who fathered her two youngest children, now three and one, has been terminated. Neither man contributes support.

Until recently, defendant lived with her three children and her sister in a modest apartment in Washington Heights, paying only $62 out of the $611 per month rent because of government subsidies. Ms. Peralta's health is good. She has worked intermittently in factories but lost her job in 1990 because of lack of work. She is now receiving both unemployment compensation and welfare payments. She filed appropriate income tax returns while working.

By arranging for care of the children, as she has in the past, defendant appears capable of earning a living. When she moved to her new apartment this month, however, she was separated from her sister, who formerly lived with her and helped with the children. Incarceration in a community treatment center is therefore not desirable; defendant will need to be at home at night. Home detention is impractical in view of the age of the children and her need to work.

Defendant is sentenced to three years probation and ordered to pay a $50 assessment and restitution of $29,481. The sentence imposed is required by statute in the court's informed discretion. If the Guidelines are held to be controlling, the court orders a downward departure in view of the government's recommendation, in order to protect the children, and for the other reasons set forth in this memorandum.

Probation shall arrange for the restitution payments so as to permit sufficient income for the family. Defendant has been working as a baby sitter and cleaning homes since her arrest. She has already made restitution of $1,051.75, scrimped from her present earnings.

During the period of probation the defendant shall provide 36 hours per week of community service, up to a maximum of 1,000 hours, unless otherwise directed by Probation because it is unduly burdensome in a particular period. If she is gainfully employed in a job for at least 36 hours per week, such employment shall count as community service. In addition, for every hour of such employment defendant is to receive a credit of $10 towards the bill for restitution. These provisions are designed to strongly encourage employment. While the court has no power to order that she not be given welfare, food stamps, Medicaid or other assistance, Probation shall take appropriate steps to ensure that such payments are minimized or eliminated as a result of gainful employment. Probation shall attempt to obtain support from the fathers.

## IV. SUMMARY OF SENTENCES

| Name | Imprisonment | Probation | Community or Home Detention | Supervised Release | Fine and/or Restitution |
|------|------|------|------|------|------|
| Concepcion | —— | 5 years | 6 months | —— | $110,831 |
| Morillo | —— | 5 years | 3 months | —— | $ 38,588 |
| Arendell | —— | 5 years | 12 months | —— | $ 90,086 |
| Caba | —— | 5 years | 3 months | —— | $ 44,713 |
| Vega | 3 years | —— | —— | 3 years | $ 65,000 |
| Arias | —— | 5 years | 3 months | —— | $ 81,752 |
| Lara | —— | 5 years | —— | —— | $ 91,674 |
| Collado | —— | 5 years | —— | —— | $ 33,348 |
| Ramirez | —— | 3 years | 3 months | —— | $ 34,686 |
| Mercedes | —— | 5 years | 12 months | —— | $ 61,356 |
| Cepin | 9 months | —— | —— | 3 years | $ 23,336 |
| Baez | 12 months | —— | —— | 3 years | $ 80,177 |
| Ogirri | 46 months | —— | —— | 3 years | $107,448 |
| Jiminez | —— | 4 years | —— | —— | $ 39,572 |
| Mack | 18 months | —— | —— | 3 years | $ 68,288 |
| Polanco | —— | 5 years | 4 months | —— | $111,023 |
| Perez | —— | 5 years | 12 months | —— | $ 52,089 |
| Garcia | —— | 5 years | —— | —— | $200,817 |
| Lopez | —— | 2 years | —— | —— | $ 29,908 |
| Peralta | —— | 3 years | —— | —— | $ 29,481 |

## V. CONTINUING OBLIGATIONS OF PROBATION DEPARTMENT

The sentences imposed in this case reflect the recognition that punishment is not an isolated moment in the life of a criminal defendant. As these cases make painfully clear, a court's sentencing decisions affect the stability and perhaps viability of entire extended families across generations. Out of recognition of the ongoing consequences of its own acts, the court seeks to provide penalties that give the Probation department considerable latitude to supervise punishments in a manner that, while providing for deterrence and retribution, does not wreak havoc on entire families and communities.

The court has consulted with the Chief Probation Officer for the Eastern District of New York, as well as with individual officers about these cases. They present considerable complexities and burdens for Probation. At the court's request, the Probation Department has made arrangements for bed space at a community treatment center in Manhattan. Approximately twen-

ty female offenders could be placed at the Le Marquis Community Correctional Center, which has a contract with the Bureau of Prisons. Using this facility and others like it would allow the Probation Department to implement the community confinement component of any sentence imposed in these twenty cases and the other thirty-five that will follow.

Child care is a confounding factor; it will have to be addressed on a case by case basis. In specific instances suitable arrangements will be made with extended family members. In the cases presenting the most difficult problems, Probation may have to call upon the Bureau of Child Welfare for placement if it cannot locate concerned and competent relatives to assume custody during the confinement portion of the sentence. Probation has recommended house detention, supervised by the Department's Home Confinement Unit, as an option in these cases since it may be more practical and humane than placing children in foster care. A problem with home detention is that the Administrative Office of the United States Courts does not yet provide funding for the installation of telephone service which would preclude electronic monitoring in a household that does not have a phone.

In the area of job placement, Probation has made arrangements for an officer who has a Master's Degree in Social Work to assume responsibility for assisting these defendants and those to be sentenced in the future with employment. The officer has been relieved of a number of her other duties and will be responsible for coordinating employment placement and for working with another Probation Officer who oversees the court's community service projects. Job placements may prove difficult because of the cultural and economic deprivation that many of these offenders bring to a marketplace suffering through difficult times. The practical issue of child care services again emerges as critical to the capability of some defendants securing full time employment.

As these and other problems arise, Probation will consult with the court to obtain necessary modifications of sentences. One of the advantages of probation is that the conditions imposed by the court can be changed to meet new problems faced by the probationer even while she is kept on a strict regimen.

The threat of criminal sanctions for probation violations remains real. Each defendant is warned that the court has incarcerated probation violators. A defendant must comply fully with her probation officer's directions.

## VI. CONCLUSION

For the reasons stated in this memorandum and orally on the record during allocutions and upon sentencing, and based upon the court's observations of defendants and upon all the files in these cases, the above sentences are imposed. The sentences are stayed pending appeals. Those defendants sentenced to prison shall be taken before a magistrate judge to reconsider bail pending appeal.

So ordered.